CHRISTOPHER JACKMAN AND WINFIELD CHASMAR, JR., PLAINTIFFS-APPELLANTS, v. JOHN M. BODINE, COUNTY CLERK OF WARREN COUNTY; HENRY B. CARR, COUNTY CLERK OF SUSSEX COUNTY; THOMAS J. GRIEVES, COUNTY CLERK OF SALEM COUNTY; BERGEN N. CARTER, JR., COUNTY CLERK OF HUNTERDON COUNTY; HENRY F. ANDERSON, COUNTY CLERK OF CAPE MAY COUNTY; ROBERT J. BURKHARDT, SECRETARY OF STATE OF THE STATE OF NEW JERSEY; FRANK S. FARLEY, PRESIDENT OF THE SENATE OF THE STATE OF NEW JERSEY, AND JOHN W. DAVIS, SPEAKER OF THE GENERAL ASSEMBLY OF THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.

Argued November 6, 1963—Reargued October 5, 1964—Decided November 25, 1964.

See also 43 *N. J.* 491, —— *A. 2d* ——.

*Mr. David Friedland* and *Mr. Jacob Friedland* (November 6, 1963 argument) argued the cause for appellants (*Mr. Edward A. Cohen,* of counsel; *Messrs. Friedland, Schneider & Friedland,* attorneys).

*Mr. Wesley L. Lance* and *Mr. James Dorment, Jr.* (November 6, 1963 argument) argued the cause for respondent President of the Senate (*Messrs. O'Mara, Schumann, Davis & Lynch,* of counsel).

*Mr. Walter H. Jones* (October 5, 1964 argument) argued the cause for respondent Speaker of the General Assembly (*Mr. Marvin H. Gladstone,* on the brief).

*Mr. John T. Madden* (October 5, 1964 argument) and *Mr. William Martin Cox* (November 6, 1963 argument) argued the cause for respondent County Clerk of Sussex County (*Messrs. Dolan & Dolan,* attorneys).

*Mr. Arthur J. Sills,* Attorney General of New Jersey (October 5, 1964 argument) argued the cause for respondent Secretary of State (*Mr. Alan B. Handler,* First Assistant Attorney General, of counsel and on the brief); *Mr. Theodore I. Botter,* First Assistant Attorney General (November 6, 1963 argument) argued the cause for respondents Secretary of State and Speaker of the General Assembly.

The opinion of the court was delivered by

WEINTRAUB, C. J. In *Baker v. Carr,* 369 *U. S.* 186, 82 *S. Ct.* 691, 7 *L. Ed. 2d* 663 (1962), the Supreme Court of the United States held justiciable the question whether the basis established by a State for election to its legislature denies equal protection of the law in violation of the Fourteenth Amendment to the Federal Constitution. It held also that the federal courts had jurisdiction of the controversy.

The majority opinion expressly refrained from stating a test to measure compliance with the equal protection provision. A view upon that topic appeared but obliquely in the majority's discussion of the claim that the lack of manageable judicial standards made the issue political and nonjusticiable. In that connection the majority opinion said (369 *U. S.,* at *p.* 226, 82 *S. Ct.,* at *p.* 715, 7 *L. Ed. 2d,* at *p.* 691):

"* * * Judicial standards under the Equal Protection Clause are well developed and familiar, and it has been open to courts since the enactment of the Fourteenth Amendment to determine, if on the particular facts they must, that a discrimination reflects *no* policy, but simply arbitrary and capricious action."

In the matter now before us, plaintiffs sought an adjudication that the provisions of our State Constitution fixing the composition of the State Legislature run afoul of the equal

protection clause. On motion the trial court held those provisions are valid because they reflect a rational policy, thus meeting the standard of the equal protection clause suggested by the above quotation from *Baker v. Carr*. *Jackman v. Bodine*, 78 *N. J. Super*. 414 (*Ch. Div.* 1963).

We certified the ensuing appeal before the Appellate Division considered it. The matter was argued before us on November 6, 1963. Aware of causes pending in the Supreme Court of the United States, we withheld decision in the hope that the opinions in those matters would spell out the demands of equal protection in this area. On June 15, 1964 the Supreme Court decided *Reynolds v. Sims*, 377 *U. S.* 533, 84 *S. Ct.* 1362, 12 *L. Ed. 2d* 506; *WMCA, Inc. v. Lomenzo*, 377 *U. S.* 633, 84 *S. Ct.* 1418, 12 *L. Ed. 2d* 568; *Maryland Committee for Fair Representation v. Tawes*, 377 *U. S.* 656, 84 *S. Ct.* 1429, 12 *L. Ed. 2d* 595; *Davis v. Mann*, 377 *U. S.* 678, 84 *S. Ct.* 1441, 12 *L. Ed. 2d* 609; *Roman v. Sincock*, 377 *U. S.* 695, 84 *S. Ct.* 1449, 12 *L. Ed. 2d* 620; *Lucas v. Forty-Fourth General Assembly of Colorado*, 377 *U. S.* 713, 84 *S. Ct.* 1459, 12 *L. Ed. 2d* 632 (1964). We then called for and received further briefs and argument with respect to the impact of those cases.

## I.

Counsel for the Speaker of the General Assembly asks that we stay our hand until the Legislature has had an opportunity to act. We do not see how we can do nothing or how such abstention would help.

There are two basic questions involved in this litigation. One is whether the legislative article of our State Constitution is invalid in the respects alleged by plaintiffs. The other, if such invalidity is found, is what must be done to meet the federal demand. Counsel's request that we abstain for the time being may be appropriate with respect to the second question, as to which we shall say more later in this opinion. But as to the first question, we cannot refuse to decide a con-

troversy that is fully accrued and justiciable. Nor, if we delayed, could the legislators conclude the quarrel. If they unanimously resolved the Legislature was validly constituted, surely plaintiffs would not accept their judgment. And if the legislators unanimously resolved their branch was not validly constituted, some citizen or taxpayer would likely demand the Court's judgment upon the issue; indeed, counsel for the President of the Senate urges the Legislature is properly constituted. Hence that critical question would likely persist until settled judicially.

## II.

In *Reynolds v. Sims, supra,* 377 *U. S.,* at *p.* 568, 84 *S. Ct.,* at *p.* 1385, 12 *L. Ed. 2d,* at *p.* 531, the Court, accepting as applicable the aphorism "one person, one vote," concluded:

"We hold that, as a basic constitutional standard, the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis. Simply stated, an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State. * * *"

These two sentences are fused in the companion opinions into the single statement that both houses of a bicameral state legislature must be apportioned "substantially on a population basis." See, *e. g., WMCA v. Lomenzo, supra,* 377 *U. S.,* at *p.* 652, 84 *S. Ct.,* at *p.* 1428, 12 *L. Ed. 2d,* at *p.* 580.

## A.

Ours is a bicameral legislature. *Art.* IV, § I of the *Constitution of* 1947 provides that "The legislative power shall be vested in a Senate and General Assembly." *Section* II, *par.* 1 reads:

"The Senate shall be composed of one Senator from each county, elected by the legally qualified voters of the county, for a term begin-

ning at noon of the second Tuesday in January next following his election and ending at noon of the second Tuesday in January four years thereafter."

*Section* III, *par.* 1 reads:

"The General Assembly shall be composed of members elected biennially by the legally qualified voters of the counties, respectively, for terms beginning at noon of the second Tuesday in January next following their election and ending at noon of the second Tuesday in January two years thereafter. The members of the General Assembly shall be apportioned among the several counties as nearly as may be according to the number of their inhabitants, but each county shall at all times be entitled to one member and the whole number of members shall never exceed sixty. The present apportionment shall continue until the next census of the United States shall have been taken. Apportionment of the members of the General Assembly shall be made by the Legislature at the first session after the next and every subsequent census, and each apportionment when made shall remain unaltered until the following census shall have been taken."

It is at once evident that these provisions of our Constitution, on their face, do not meet the quoted test of *Reynolds v. Sims*. As to the General Assembly, the apportionment is basically upon population, and it may readily be urged that the apportionment is substantially on population notwithstanding that each county is entitled to one member and the whole number of members may not exceed 60.[1] But as to the Senate, it is perfectly plain that the apportionment basis is indif-

---

[1] The Colonial *Constitution of* 1776 provided for two houses, one to be based on population and the other upon equal representation from the counties, without regard to population. *Art.* III. See *fn.* 4 *infra*. As to the popular house, the Legislature was authorized from time to time to add to or diminish representation therein "on the principles of more equal representation." Reapportionments did occur, the Assembly being increased from 39 to 58 by 1841. *Reock, Population Inequality among Counties in the New Jersey Legislature, p.* 10.

The *Constitution of* 1776 was replaced by the *Constitution of* 1844, which contained the same provisions that appear in the present *Constitution of* 1947. No doubt the maximum of 60 in the General Assembly was fixed to keep the membership at a manageable number, although perhaps also to discourage the creation of new counties for purely political ends. The county was used because it represented existing political and area units and its use would block or minimize

ferent to population. This is true in the literal terms of the
constitutional provision; it is equally true in its actual opera-
tion because the counties vary widely in population.[2]

■ If the Senate is malapportioned, we need not consider
whether the General Assembly could pass muster. In *Lucas*

gerrymandering. In 1844, only one county had fewer inhabitants
than the representative ratio obtained by dividing the population of
the State by the number of seats. In 1862, for the first time, two
counties fell below the representative ratio. That number reached a
maximum of eight in 1922. In 1960 there were five counties so
situated. *Reock, op. cit. supra, pp.* 16–17.

*Reynolds v. Sims* recognized the propriety of using existing counties
with an assurance of a minimum of one member to a county, provided
the counties are not so numerous and so sparsely settled as to scuttle
the population approach in apportionment. 377 *U. S.* 533, 84 *S. Ct.*
1362, 12 *L. Ed.* 2d, at *pp.* 537–538.

The present attack upon the General Assembly emphasizes that 21
of 60 seats are allocated without regard to population, a mode of
expression which tends to accentuate the imbalance. The Attorney
General replies that of the five counties which have less than the
representative ratio, three have more than one-half a ratio and the
other two are just short of that fraction; that the population of those
five counties, if aggregated, would be entitled to 2.71 seats in the
General Assembly, so that the allocation of five seats to those counties
means that only 2.29 seats out of 60, less than 4%, are required to
be apportioned differently from a strict population basis.

Upon the reapportionment in 1962, based on the 1960 census, the
average relative population deviation from the theoretical representa-
tive ratio was 20.2%; the ratio between the largest and smallest
constituencies was 2.96; and the minimum percentage of population
in counties theoretically electing a majority of assemblymen was 46.5.
*Reock, op. cit. supra, p.* 11. These figures reflect the impact of the
five small counties, rather than the experience as among themselves
of the 16 counties which share the remaining 55 seats.

[2] The 1960 census shows:

| | | | |
|---|---|---|---|
| Atlantic | 160,880 | Mercer | 266,392 |
| Bergen | 780,255 | Middlesex | 433,856 |
| Burlington | 224,499 | Monmouth | 334,401 |
| Camden | 392,035 | Morris | 261,620 |
| Cape May | 48,555 | Ocean | 108,241 |
| Cumberland | 106,850 | Passaic | 406,618 |
| Essex | 923,545 | Salem | 58,711 |
| Gloucester | 134,840 | Somerset | 143,913 |
| Hudson | 610,734 | Sussex | 49,255 |
| Hunterdon | 54,107 | Union | 504,255 |
| | | Warren | 63,220 |

the Supreme Court held that if one house is malapportioned, the deficiency vitiates the entire legislative structure, obviating the need for considering whether the second house could withstand an attack upon it if it were the sole legislative body. 377 *U. S.*, at *p.* 713, 84 *S. Ct.*, at *p.* 1459, 12 *L. Ed. 2d*, at *pp.* 646–47. The reason is that a court cannot fairly assume the people would have intended the one house to survive as the lone repository of the legislative power. Hence, if the Senate is fatally constituted, an expression by us upon the General Assembly would be wholly advisory, there being no remedial proposal before us continuing a legislative body structured as is the General Assembly.

In view of the allocation of one senator to each county, none of the parties before us suggests that our Legislature literally meets the quoted standard of *Reynolds v. Sims,* but counsel for the President of the Senate, while conceding that much, does contend that our constitutional plan is nonetheless beyond the thrust of *Reynolds v. Sims* for other reasons to which we now turn.

## B.

The principal argument upon which *Reynolds* is sought to be distinguished runs this way: our legislative plan is essentially the same as that of the Congress and is republican in form; the conclusion in *Reynolds* that both houses must be apportioned upon population stems from the concept of "one person, one vote"; and since the people at a statewide poll approved the present Constitution on the basis of "one person, one vote," it should follow that the demands of equal protection of the law were met.

One component of the argument is that the state and federal legislatures are essentially the same in structure. We think this is correct. As to the Senate, both Constitutions provide for equal representation of people of existing political areas without regard to their numbers, the Federal Constitution providing for two senators "from each State" (*Art.* I, §

3; Seventeenth Amendment), while the State Constitution, quoted above, provides for one member "from each county." (*Art.* IV, § II, *par.* 1.) As to the lower house, both Constitutions call for apportionment according to population and both assure one representative to each "State" in the case of the Federal Constitution (*Art.* I, § 2) and to each "county" in the case of the State Constitution (*Art.* IV, § III, *par.* 1). The Federal Constitution does not specify the maximum membership of the House, beyond saying that the number of representatives shall not exceed one for every 30,000 people, while the State Constitution fixes the membership at not more than 60. We see no significance in this difference.[3]

In this connection we note that the counties of our State were established to meet the needs of population centers as they developed, and that whatever partisan advantage may have been thought to reside in the creation of a particular county, county lines have not since been manipulated for such gain. No new counties have been established since 1857, and as a practical matter under our existing Constitution no one today would attempt to gerrymander county lines for partisan purposes. The citizens of each county have a community of interest by virtue of their common responsibility to provide

---

[3] There is a further difference which we think of no moment in the present context. The Federal and State Constitutions provide for apportionment of the members of the lower house among the States and counties respectively. The federal legislators are elected from single-member districts within a State pursuant to federal statute, whereas our State assemblymen are elected by the voters of the entire county rather than of a district therein. The election of assemblymen from single-member districts within a county was held to violate the State Constitution in *State ex rel. Morris v. Wrightson*, 56 *N. J. L.* 126, 201, 28 *A.* 56, 22 *L. R. A.* 548 (*Sup. Ct.* 1893), and *Smith v. Baker*, 74 *N. J. L.* 591, 64 *A.* 1067 (*E. & A.* 1906). In *Lucas* the majority characterized elections at large within a county as one of "the most undesirable features" of the Colorado apportionment scheme and as a "debatable feature" (377 *U. S.* 713, 84 *S. Ct.* 1459, 1471, 12 *L. Ed. 2d*, at *p.* 644), but added in *fn.* 21 that "We do not intimate that apportionment schemes which provide for the at-large election of a number of legislators from a county, or any political subdivision, are constitutionally defective."

for public needs and their investment in the plants and facilities established to that end. Anciently, and still today, the counties reflect different economic interests, atlhough of course these economic interests are not perfectly contained or separated by any political line, municipal, county or State. So, certain counties have a dominant concern with manufacturing and commerce; others have a large stake in agriculture; still others lean heavily upon the resort industry; and finally a few counties have a special interest in the products of the sea. And of course there may be competing area interests in such matters as highways, taxation, and water supply.

Hence we think it correct to say that our State Legislature does parallel the federal plan. We think it also true that our legislative structure is a republican form of government within the meaning of *Article* IV, § 4 of the Federal Constitution under which "The United States shall guarantee to every State in this Union a Republican Form of Government." Our present legislative plan is essentially the same as that provided in our *Constitution of* 1776.[4] The forms of government in the States at the time the Union was formed are deemed to be "republican." *Minor v. Happersett,* 21 *Wall.* 162, 88 *U. S.* 162, 22 *L. Ed.* 627, 631 (1875).

This brings us to the question whether the comparability of structure of our State Legislature with that of the Federal Congress can be significant in this controversy.

---

[4] The *Constitution of* 1776, Art. III, provided for equal representation by counties in the Council, which was the upper house, and as to the Assembly provided that each county shall have three members "* * * provided, always, that if a majority of the representatives of this province, in council and general assembly convened, shall, at any time or times hereafter, judge it equitable and proper to add to or diminish the number or proportion of the members of the assembly for any county or counties in this colony, then, and in such case, the same may, on the principles of more equal representation, be lawfully done. anything in this charter to the contrary notwithstanding; so that the whole number of representatives in assembly shall not, at any time, be less than thirty-nine." The Legislature did reapportion from time to time, increasing the Assembly from 39 to 58 by 1841. *Reock, Population Inequality among Counties in the New Jersey Legislature, p.* 10.

The contending views upon the "federal analogy," as it is called, are well known. On the one hand, it is urged that equal protection requires an equal voice in the selection of legislators to the end that the power to legislate shall reside with the majority of the voters; that both houses, if there are more than one, must be so constituted as to assure the majority will; that the voters' rights are not equal if the amount of their representation depends upon the place where they live or the numbers of their neighbors; that the argument that the minority who elect the majority of one house, being unable to legislate without the concurrence of the popular house, can exercise only a restraining role in the legislative process is of no force because, for protection against the majority, the minority must look to the Bill of Rights and the other limitations upon the popular will to be found in our constitutional plan of government; that area interests receive adequate voice when elections are held in districts rather than at large; and finally that the federal plan cannot be deemed to reflect a different view of the demands of equal protection because the federal structure was devised as a compromise by 13 sovereign States, whereas the counties are mere political divisions or agencies of the State without any sovereignty of their own.

The argument the other way notes that actually the 13 States had already agreed "that the Union shall be perpetual" by the Articles of Confederation, *Art.* XIII, but nonetheless, if it be granted that the 13 States (perhaps more strictly their inhabitants, *i. e.,* "WE THE PEOPLE of the United States") bargained as sovereigns in the formation of a new constitution, still it does not follow that the "compromise" they reached was an arbitrary invention which denied the people of the United States something so fundamental as equal protection of the law.[5] Rather, it is argued, the States agreed

---

[5] In *United States v. Cruikshank,* 92 *U. S.* 542, 23 *L. Ed.* 588, 592 (1875), the Court said that "* * * equality of the rights of citizens is a principle of republicanism. Every republican government is in duty bound to protect all its citizens in the enjoyment of this principle, if within its power."

upon that plan because it was well suited to meet the needs of the people, needs which are the same whether the relationship involved is between the people and the Federal Government or between the people and the State Government; that the plan thus accepted was not originated at the Constitutional Convention of 1787, but in fact was an existing form of government, New Jersey for one having that form and of course having adopted it without the pressure of the need for a political union among sovereign entities.

The argument continues that so long as the membership in one house is based on population, the affirmative power to legislate remains in the majority of the people for the reason that the house apportioned on the basis of area can exercise only a veto power; that this veto power is no different in principle from the sundry other restraints upon the majority will which give character to our constitutional plan of government. The point pressed is that no man is a member of the majority upon all issues and hence all the citizens have in common a concern that their interests as members of sundry minorities may not be heard or adequately considered by the majorities of the moment upon a particular issue; that there is no single way for the majority to express its will upon the many topics which arise in the Legislature, even political parties being inadequate to that end; that although county lines surely do not mark the boundaries of most interests, still they reflect enough to permit the majority to vest a veto in a house in which each such area has an equal voice; that despite the constant threats of deadlock and doom which abound in our constitutional system, the necessary statesmanship appears when the need is great, and the experience at the federal level so demonstrates.

Indeed, they argue, the election of State legislators from districts rather than at large from the entire State bespeaks the existence of area interests. More than that, elections by districts involve the same or equal vice, if such it is, of denying a person a meaningful vote because of the place where he

lives; that this is so because a man who votes with the minority party in the county casts a vote which, while it will be counted, surely will not count in the election to these State legislative offices, whereas if the legislators were chosen at large in a statewide election, his vote would not be trapped by district lines. Hence, unless all State legislators are elected at large, it must follow in one way or another that a person will be denied a truly equal vote because of the place in which he lives, while others gain a voice on that very account. In fact, as Mr. Justice Stewart points out in *WMCA, 377 U. S.,* at *p.* 633, 84 *S. Ct.,* at *p.* 1418, 12 *L. Ed. 2d,* at *p.* 585, *n.* 12, districting necessarily means that something less than 50% of the voters may carry the day, and permits a percentage a little over 25 to elect, on party lines, a majority of the legislators.

This debate is not new in our State. The same subject was discussed 120 years ago in like terms and with specific reference to the validity of the "federal analogy." The occasion was the Constitutional Convention of 1844, and the dialogue ran virtually throughout the period of the Convention as reported in *Proceedings of the New Jersey State Constitutional Convention of* 1844.

The proponents of pure majority rule not only assailed the election of senators on a basis other than population, but also attacked the gubernatorial veto as "anti-republican and anti-democratic" (*p.* 191), contending it intruded upon the power of a majority to legislate, while defenders of the veto spoke of it as "guarding against hasty legislation" and cited the federal plan to support their position (*p.* 180). Upon the same majority theme, it was urged that a majority vote should suffice to amend the Constitution, and again the validity of the federal analogy was argued (*pp.* 57–70). The critical proposal that senators be elected from districts of equal population was finally defeated 37 to 15 (*pp.* 512–13). It is interesting that the delegates to the Convention, which included many of the distinguished figures of that day, *Introduction, Proceedings of the New Jersey State Constitutional Conven-*

*tion* 1844, *p.* 1xx, were well selected upon the basis of the population.[6]

■ We have sketched the argument upon the merits of the federal analogy. We need not express our views upon this lively subject since we are satisfied that the Supreme Court has settled the matter and has held that a State legislature, constituted as is the Congress, denies equal protection of the law.

It is true that in none of the cited cases did the State legislature faithfully accord with the federal pattern. In fact, the majority noted the discrepancy. Nonetheless the majority characterized the discrepancy as merely an additional circumstance[7] and deliberately rejected the federal analogy. Thus in *Reynolds* the majority, after agreeing that the Alabama plan did not at all match the federal plan, added that it finds "the federal analogy inapposite and irrelevant to state legislative districting schemes." 377 *U. S.,* at *p.* 573, 84 *S. Ct.,* at *p.* 1387, 12 *L. Ed. 2d,* at *p.* 533. The majority expanded upon

---

[6] The delegates were elected on the same basis as assemblymen. *L.* 1844, *p.* 112, § 2. As pointed out in *fn.* 4, *supra,* the General Assembly had been apportioned according to population pursuant to *Art.* III of the *Constitution of* 1776. As of 1844, there were 58 assemblymen and only one county had less than a full representative ratio. *Reock, Population Inequality among Counties in the New Jersey Legislature, p.* 16. The average relative population deviation from a full representative ratio was 12.8; the ratio between the largest and smallest constituencies was 1.98; and the minimum percentage of population in counties electing a majority of the assemblymen was 47.2. *Reock, op. cit. supra, p.* 10. The delegates to the Constitutional Convention of 1844 were elected in these numbers from the counties: Atlantic, 1; Bergen, 2; Burlington, 5; Camden, 2; Cape May, 1; Cumberland, 3; Essex, 7; Gloucester, 2; Hudson, 1; Hunterdon, 4; Mercer, 3; Middlesex, 4; Morris, 4; Monmouth, 5; Passaic, 2; Salem, 3; Somerset, 3; Sussex, 3; Warren, 3. *Proceedings of the New Jersey State Constitutional Convention of* 1844, at *pp.* 15–17.

[7] *Reynolds v. Sims,* 377 *U. S.* 533, 84 *S. Ct.* 1362, 12 *L. Ed. 2d,* at *p.* 533 *n.* 49; *Maryland Committee v. Tawes,* 377 *U. S.* 656, 1429, 12 *L. Ed. 2d,* at *p.* 607 *n.* 21; *Lucas v. Colorado General Assembly,* 377 *U. S.* 713, 84 *S. Ct.* 1459, 12 *L. Ed. 2d,* at *p.* 648 *n.* 32.

that statement (377 *U. S.*, at *pp.* 574–575, 84 *S. Ct.*, at *pp.* 1388–1389, 12 *L. Ed. 2d*, at *pp.* 534 and 535) :

"The system of representation in the two Houses of the Federal Congress is one ingrained in our Constitution, as part of the law of the land. It is one conceived out of compromise and concession indispensable to the establishment of our federal republic. Arising from unique historical circumstances, it is based on the consideration that in establishing our type of federalism a group of formerly independent States bound themselves together under one national government. Admittedly, the original 13 States surrendered some of their sovereignty in agreeing to join together 'to form a more perfect Union.' But at the heart of our constitutional system remains the concept of separate and distinct governmental entities which have delegated some, but not all, of their formerly held powers to the single national government.

\* \* \* \* \* \* \* \*

Political subdivisions of States—counties, cities, or whatever—never were and never have been considered as sovereign entities. Rather, they have been traditionally regarded as subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental functions.

\* \* \* \* \* \* \*

Thus, we conclude that the plan contained in the 67-Senator Amendment for apportioning seats in the Alabama Legislature cannot be sustained by recourse to the so-called federal analogy. Nor can any other inequitable state legislative apportionment scheme be justified on such an asserted basis. This does not necessarily mean that such a plan is irrational or involves something other than a 'republican form of government.' We conclude simply that such a plan is impermissible for the States under the Equal Protection Clause, since perforce resulting, in virtually every case, in submergence of the equal-population principle in at least one house of a state legislature.

Since we find the so-called federal analogy inapposite to a consideration of the constitutional validity of state legislative apportionment schemes, we necessarily hold that the Equal Protection Clause requires both houses of a state legislature to be apportioned on a population basis."

The majority then rejected the view that the veto power may be reposed in one house if the other is apportioned on population, saying (377 *U. S.*, at *p.* 576, 84 *S. Ct.*, at *p.* 1389, 12 *L. Ed. 2d*, at *p.* 535) :

"\* \* \* Deadlock between the two bodies might result in compromise and concession on some issues. But in all too many cases the more probable result would be frustration of the majority will through minority veto in the house not apportioned on a population basis, \* \* \*."

It may not be clear whether the quoted language means that the federal legislative structure involves a denial of equal protection of the laws which must be tolerated as the perpetual price of the union of 1787, or whether it means that the relationship of the federal government to the people is intrinsically so different from the relationship of the state government to the people that the same legislative system is consistent with equal protection of the laws in the one case but not in the other.[8] Whichever the rationale, the result is dispositive.

■ This brings us to the final step of the effort to distinguish *Reynolds, i. e.,* that even if a counterpart of the federal legislature does not *per se* satisfy the doctrine of "one person, one vote," still the majority of our voters fully expressed their will in statewide elections conducted on a "one person, one vote" basis when they voted to hold the Constitutional Convention of 1947 and thereafter to adopt the constitution the Convention proposed.

There are two difficulties with this contention.

The first difficulty is factual. The statute which submitted to referendum the question whether there should be a convention provided "that the convention shall in no event agree upon, propose or submit to vote of the people * * * any provision for change in the present territorial limits of the respective counties, or any provision for legislative representation other than provision for a Senate composed of one Sen-

---

[8] Earlier in *Reynolds*, in rejecting legislative schemes in which a minority may elect a majority to both houses and thus capture the power affirmatively to legislate, the majority opinion said (377 *U. S.,* at *p.* 566, 84 *S. Ct.,* at *p.* 1384, 12 *L. Ed.* 2*d*, at *p.* 530):

"* * * Our constitutional system amply provides for the protection of minorities by means other than giving them majority control of state legislatures. *And the democratic ideals of equality and majority rule, which have served this Nation so well in the past, are hardly of any less significance for the present and the future.*" (Emphasis added)

It would not seem likely that the majority opinion intended to place the federal legislature beyond "the democratic ideals of equality and majority rule."

ator from each county and a General Assembly composed of not more than sixty members apportioned among the counties according to population so that each county shall at all times be entitled to at least one member, chosen for, and elected by the legal voters of, the respective counties." *L*. 1947, *c*. 8, § 2, *p*. 25. The delegates were required to take an oath binding them to that limitation. *L*. 1947, *c*. 8, § 21, *pp*. 35–36.

Although it is true that the people voted for the referendum as thus clearly limited and adopted also the constitution the Convention proposed, it would be quite unreal to say the people had a meaningful choice. The alternative was to vote down the program, in which event the identical legislative pattern would have persisted by virtue of the *Constitution of* 1844.

Nor is the factual claim improved by examining the basis for the selection of delegates to the Convention. The people of each county had as many delegates as they had in a joint session of the Legislature. *L*. 1947, *c*. 8, § 4, *p*. 26. Thus each county had a number equal to its share of assemblymen, plus one. Hence the delegates were not apportioned upon population. In this respect the convention process did not match the process in 1844 when, as already noted, the delegates were allotted on the basis of representation in the lower house only and accordingly were apportioned essentially on a population basis.

The second reason why the vote in 1947 is of no consequence is that the decision of a majority in 1947 could hardly foreclose the right of succeeding majorities to equal protection. The proposition which is sought to be tendered to us could not have arguable substance unless there were continuously available a practical remedy whereby the majority of the people could at reasonable times select another republican form of government. Our State Constitution does proclaim the inherent power in the people to change the Constitution, saying in *Article* I, *par*. 2 :

"All political power is inherent in the people. Government is instituted for the protection, security, and benefit of the people, and

they have the right at all times to alter or reform the same, whenever the public good may require it."

However, there is no machinery in our State, constitutional or statutory, whereby the people can alter the legislative branch of government on their own initiative.

This being so, we are not called upon to say whether a republican form of government plus a continuing feasible opportunity in the people to initiate a change to another republican form would give adequate effect to the doctrine of "one person, one vote."[9]

---

[9] In *Lucas* the majority found "the initiative device provides a practicable political remedy to obtain relief against alleged legislative malapportionment in Colorado" (377 *U. S.*, at *p.* 732, 84 *S. Ct.*, at *p.* 1471, 12 *L. Ed. 2d*, at *p.* 645), but concluded (377 *U. S.*, at *p.* 737, 84 *S. Ct.*, at *p.* 1474, 12 *L. Ed. 2d*, at *pp.* 647–48) :

"We hold that the fact that a challenged legislative apportionment plan was approved by the electorate is without federal constitutional significance, if the scheme adopted fails to satisfy the basic requirements of the Equal Protection Clause, as delineated in our opinion in *Reynolds v. Sims*. And we conclude that the fact that a practicably available political remedy, such as initiative and referendum, exists under state law provides justification only for a court of equity to stay its hand temporarily while recourse to such a remedial device is attempted or while proposed initiated measures relating to legislative apportionment are pending and will be submitted to the State's voters at the next election."

In the other cases the majority noted the absence of the initiative but in each instance appended a footnote reading :

"For a discussion of the lack of federal constitutional significance of the presence or absence of an available political remedy, see *Lucas* * * *."

*WMCA v. Lomenzo, supra,* 377 *U. S.,* at *p.* 652, 84 *S. Ct.,* at *p.* 1427, 12 *L. Ed. 2d,* at *p.* 579, *n.* 18; *Reynolds v. Sims, supra,* 377 *U. S.* 533, 84 *S. Ct.* 1362, 12 *L. Ed. 2d,* at *p.* 522, *n.* 25; *Maryland Committee v. Tawes, supra,* 377 *U. S.* 656, 84 *S. Ct.* 1429, 12 *L. Ed. 2d,* at *p.* 603, *n.* 9; *Davis v. Mann, supra,* 377 *U. S.* 678, 84 *S. Ct.* 1441, 12 *L. Ed. 2d,* at *p.* 616, *n.* 6; *Roman v. Sincock, supra,* 377 *U. S.* 695, 84 *S. Ct.* 1449, 12 *L. Ed. 2d,* at *p.* 627, *n.* 12.

The question is why the absence of a given fact is noted and then followed by a footnote that seems to say its presence would not matter. It may be that since the Court was breaking new ground and

## C.

The remaining point pressed by counsel for the President of the Senate is that New Jersey withdrew its ratification of the Fourteenth Amendment before the Amendment became effective and hence New Jersey retained its "sovereign" right to its own form of government. Plaintiffs dispute the factual premise, but we think it makes no difference whether New Jersey did or did not approve the Amendment.

Counsel of course does not contend for a general proposition that an amendment of the Federal Constitution binds only the ratifying States. Rather he contends the present situation is exceptional and so argues on the basis of so much of *Reynolds v. Sims* as rejects the federal analogy. The argument is that if the structure of the federal legislature is valid notwithstanding its clash with the concept of equal protection only because 13 sovereigns compromised upon the plan, it ought to follow that each of those sovereigns retained by implication the sovereign power to control its own form of government, subject only to the federal guarantee of a "republican" form of government, under *Art.* IV, § 4 of the Federal Constitution. Thus New Jersey, as one of the contracting parties, could not be bound by an alteration affecting sovereignty to which it did not agree.

We think the answer is that the Federal Constitution contains all the terms of the "contract," if it be so viewed, and that Constitution restrains the process of amendment in but

avowedly developing the doctrine on a case-by-case basis, see *Reynolds v. Sims, supra,* 377 *U. S.* 533, 84 *S. Ct.* 1362, 12 *L. Ed.* 2d, at *p.* 537, some members of the majority wished to note a fact that might later prove to be material. Since the majority may have felt all the plans before the Court smacked of the "crazy-quilt," the opinions may mean only that a crazy-quilt plus the initiative will not add up to equal protection, and hence the cases may not foreclose the possibility of a holding that equal protection is provided if the majority adopts a republican plan and holds a power to change which does not depend upon the Legislature's will.

three respects, of which the form of the state government is not one.[10]

 The legislative article of our State Constitution must therefore be adjudged to be invalid insofar as it deals with the apportionment of the members of the Legislature.

## III.

We come then to the matter of judicial relief.

 We need not explore the abstract question whether a legislature, thus constituted in violation of the equal protection clause, can exercise the legislative power. The answer is provided abruptly· by sheer necessity. The familiar doctrine which prevents collateral attack upon past acts of *"de facto"* officials rests upon an underlying need for governmental order. That need is even more imperative when the spectre proposed is a government without legislative power. The answer must be that the legislators continue in office with the powers of their branch of government, subject however to the duty of the State to bring the legislative branch into harmony with the Federal Constitution with diligence.

The duty to comply with the equal protection clause rests upon the three branches of State Government and upon the people of the State as well. The question is what part must be played by each.

 We think it clear that the judiciary should not itself devise a plan except as a last resort. The reasons, simply stated, are that the prescription of a plan of apportionment is laden with political controversy from which the judiciary cannot be too distant, and further, that if the judiciary should devise an interim plan, that plan will likely seem so attractive to some as to impede the search for common agreement. We therefore will confine our role for the present to the minimum

---

[10] *Art.* V contains the proviso "that no Amendment which may be made prior to the Year One thousand eight hundred and eight shall in any Manner affect the first and fourth Clauses in the Ninth Section of the first Article; and that no State, without its Consent, shall be deprived of its equal Suffrage in the Senate."

demands of the Federal and State Constitutions, retaining jurisdiction, upon applications directly to us and within this cause, to grant further relief if circumstances so require and to resolve such additional issues as may arise.

We think it clear from *Reynolds v. Sims* that further elections to the Legislature cannot be held upon the existing constitutional plan. It follows that there must be a reapportionment in time for a general election of all legislators in November 1965. As a practical matter the Legislature must be held to have the power to legislate an interim solution in time for that election. The primary dates may, of course, be changed, if need be, to permit a seasonable selection of candidates for both houses. The Legislature may fix the date for the commencement of the terms of the new incumbents, not later, however, than the second Tuesday in January 1966, the time fixed for the commencement of the legislative year in *Art.* IV, § I, *par.* 3. The legislators so elected may continue in office until the qualification of their successors elected under a permanent plan, subject to the time limitation hereinafter stated.

The more difficult question is how a permanent plan may be devised, more specifically whether the plan may be proposed only by a constitutional convention or whether the Legislature may initiate some other process to that end.

Our Constitution deals expressly with the process of amendment. It is silent as to constitutional conventions, but it is perfectly clear that the Legislature may provide, as it did in 1844 and in 1947, the machinery whereby the people can meet in convention through their delegates in pursuit of their "right at all times to alter or reform" the government. *Constitution of 1947, Art.* I, *par.* 2. *Jameson, Constitutional Conventions (4th ed. 1887)* § 574d, *p.* 615; *In re Opinion to the Governor,* 55 *R. I.* 56, 178 *A.* 433 (*Sup. Ct.* 1935); *George, Amendment and Revision of State Constitutions,* 2 *Proceedings of Constitutional Convention of 1947,* 1759, 1762.

It is generally said that amendments deal with limited changes or additions, the convention to be employed to effect

a revision. As expressed in *Jameson, Constitutional Conventions* (*4th ed.* 1887) § 574c, *pp.* 610–11:

"* * * Now, it is very clear on the face of the constitutional provisions authorizing amendments through the agency of the legislature, as compared with those authorizing the call of Conventions, that the purpose of the former is different from that of the latter; in other words, the thing authorized to be done by the one class of provisions is a different thing from that authorized to be done by the other. Thus, the purpose of the legislative mode is to bring about amendments which are few and simple and independent; and on the other hand, that of the mode through Conventions is to revise the entire Constitution, with a view to propose either a new one, or, as the greater includes the less, to propose specific and particular amendments to it."

See also *In re Opinion to the Governor, supra,* 55 *R. I.,* at *p.* 56, 178 *A.,* at *p.* 439; *Livermore v. Waite,* 102 *Cal.* 113, 36 *P.* 424, 25 *L. R. A.* 312 (*Sup. Ct.* 1894); *Rivera-Cruz v. Gray,* 104 *So.* 2d 501 (*Fla. Sup. Ct.* 1958); *Ellingham v. Dye,* 178 *Ind.* 336, 99 *N. E.* 1 (*Sup. Ct.* 1912), appeal dismissed *sub nom. Marshall v. Dye,* 231 *U. S.* 250, 34 *S. Ct.* 92, 58 *L. Ed.* 206 (1913); *cf. McFadden v. Jordan,* 32 *Cal.* 2d 330, 196 *P.* 2d 787 (*Sup. Ct.* 1948).

Some members of the Court believe that a Constitutional Convention is the sole permissible method of dealing with the problem before us, for the reasons stated in their footnote.[11] The other members of the Court agree a convention is certainly a permissible method. They are concerned, however, with whether, or in what circumstances, this Court can or should declare it to be the sole method. They believe we need not and should not now decide this question or the related one whether the Legislature elected in November 1965 as required above may not itself propose the necessary constitu-

---

[11] They believe only the convention process may be employed, for several reasons.

Our Constitution authorizes the Legislature only to propose "Any specific amendment or amendments," *Art.* IX, *par.* 1. It does not authorize the Legislature to propose a revision. See *Dodd, The Revision and Amendment of State Constitutions* (1910), *p.* 260, *n.* 245.

The purpose of an amendment is to alter, by change or supplement, an existing expression of the people's will. Ordinarily it is not im-

tional changes through another process. Hence they withhold any expression on this phase of the matter.

■ If the Legislature should decide to call a Constitutional Convention, then all members of the Court agree upon the following: Since the legislative article must be altered, we see no need to submit to the vote of the people the question whether a convention should be called. Nor do we think it necessary to await the election in November 1965 of a properly apportioned legislative body. The present Legislature can start the process, provided the delegates are required to be elected on a basis that is beyond dispute. We take it, for example, that in the light of our traditions, no one would seriously question elections from the counties, provided the representa-

---

perative that the people adopt an amendment; they may accept or reject a proposal, and if they reject it, the existing expression continues to prevail. But in the present matter, the people cannot choose whether to act or not to act because there is a fundamental void which must be filled if there is to be a government. As the Constitution now stands, there is a grant of the legislative power to a legislature without structure or body. This is so, not by design, but rather because a structure, fully provided, has been found to be invalid. Stated in other terms, the Constitution is fundamentally incomplete, an unfinished document, and the power to complete it should be exercised by the people through the process suited for such original creation, *i. e.*, a constitutional convention. *Cf. Ellingham v. Dye*, *supra*, 178 *Ind.* 336, 99 *N. E.*, at *p.* 9.

That the amendatory process is not suited to meet this imperative need is evident from the procedure whereby the Constitution deliberately encumbered that process. If a proposal is "agreed to by three-fifths of all the members of each of the respective houses," it may be submitted to the people, but failing that measure of agreement, the proposal must have the vote of "a majority of all the members of each" house in two successive legislative years. *Art.* IX, *par.* 1. The proposal shall be submitted "at the next general election." *Par.* 4. If a proposed amendment shall not be approved, "neither such proposed amendment nor one to effect the same or substantially the same change in the Constitution shall be submitted to the people before the third general election thereafter." *Par.* 7.

These restraints, designed to slow the amendatory process to discourage imprudent measures, make the process inappropriate for the urgent need at hand. It might take years to muster the exacting vote required to put a proposal on the ballot, and if the proposal should be rejected by the people, the provision in *paragraph 7* quoted above

tive ratio is the population of the county smallest in population. We think the call for a convention, the election of delegates, the submission of a proposal, a vote thereon by the people, and the nomination of candidates for election to the Legislature should be completed in time for a final election to the Legislature in November 1967. Accordingly, if the convention process is used, the terms of the legislators elected in November 1965 under an interim plan may be permitted to continue until such time as their successors qualify, but not beyond the second Tuesday in January 1968.

If, however, the Legislature does not initiate the convention process by April 1, 1965, then the Court will call for argument as to whether another process may be used, the time

---

relating to submission of proposals "to effect the same or substantially the same change" might present serious difficulties.

And finally the amendatory process is inappropriate because it cannot give the people the free range of decision which they should have with respect to the organic structure of government. The power to propose a solution may be the virtual power to control it. *Cf. Rivera-Cruz v. Gray, supra*, 104 *So. 2d*, at *p*. 503. As a practical matter, the electorate cannot easily reject a proposal when some proposal must be adopted and it cannot know whether an even less palatable one will follow. The practical power to control the solution would be in the hands of the very branch of government to be affected by it.

A Constitutional Convention could effectively thrash out the many subjects which the present exigency projects. For example, shall there be a bicameral or a unicameral legislature? How large shall the house or houses be? What shall be the terms of office and shall the terms be staggered? Shall elections be by districts, and if so, shall the districts be related to existing county lines? Should a member be elected from a single district or should there be multi-member districts? What provisions can be adopted to deal with the threat of gerrymandering if the districts are to be fixed from time to time? Should the task of periodic reapportionment rest with the Legislature or rest with some other agency, either initially or in the event the Legislature does not act? Should there be a right in the people to initiate changes affecting the Legislature so that the principal's inherent power to change need not depend upon the agent's willingness to submit a proposal?

We have referred to sundry topics, not to suggest that all of them are worthy of resolution by the people, but rather to indicate their range is so great that a convention of delegates specially chosen for the role is the sole, suitable machinery to propose a plan to complete the legislative article of the Constitution.

limit within which proposals must be submitted to the people, and the impact of the use of another process upon the terms of office of the legislators to be elected in November 1965.

The judgment under review is reversed and a judgment will be entered in this Court:

(1) Adjudging the Legislature to be apportioned in violation of the equal protection clause of the Constitution of the United States;

(2) Enjoining any further elections under the apportionment basis now provided by law;

(3) Declaring that the legislative power may not be exercised after the second Tuesday in January 1966 except by legislators elected not later than November 1965 under a basis consonant with the equal protection clause;

(4) Adjudging that the Legislature may by statute provide an interim basis, consonant with the equal protection clause, for the election of the legislators as provided in (3) above;

(5) Declaring that proposals to amend the State Constitution to comply with the equal protection clause may be submitted by a Constitutional Convention called by the Legislature, the delegates to which Convention shall be apportioned according to population; and reserving the question whether proposals to amend or revise the State Constitution may be submitted by another process by the Legislature elected in compliance with (3) and (4) above;

(6) Adjudging that the legislators elected pursuant to (3) and (4) above may hold office for a period not extending beyond the second Tuesday in January 1968 if the Legislature initiates the convention process by April 1, 1965;

(7) Ordering that if the Legislature does not initiate the convention process by April 1, 1965, there be brought on for argument at such time as the Court may fix, the question reserved in (5) above and the impact of the use of another process upon the terms of office of the legislators to be elected in November 1965;

(8) Reserving jurisdiction in this cause to determine applications for such further or different relief as may be appropri-

ate and to determine such further relevant controversies as may arise.

No costs.

HANEMAN, J. (concurring). There comes a time in the career of practically every judge when he must embrace a theory of law to which he does not personally subscribe. This occurs by virtue of the establishment thereof by some superior authority. Under our judicial system this is entirely proper because such a mandate is the basis and the essence of the stability of our law. That, however, is not to say that he is rendered mute by force of superior precedents. He continues to have the privilege, and on occasion the obligation, to expose his respectful disagreement while at the same time acceding to administer the letter of the law as so directed. In *Reynolds v. Sims*, 377 *U. S.* 533, 84 *S. Ct.* 1362, 12 *L. Ed.* 2d 506, 530 (1964), the United States Supreme Court said that "a denial of constitutionally protected rights demands judicial protection; our oath and our office require no less of us." To paraphrase, I conceive that although I am bound by a construction of the United States Constitution by the United States Supreme Court, my oath and my office as a Justice of the New Jersey Supreme Court require that I express my disagreement where such construction, in my opinion, impinges upon the constitutional rights of the citizens of this State. I now find myself in that position. I therefore vote with the balance of this Court in the matter *sub judice* because of the interpretation of that document by the United States Supreme Court as delineated in *Reynolds v. Sims, supra; WMCA, Inc. v. Lomenzo*, 377 *U. S.* 633, 84 *S. Ct.* 1418, 12 *L. Ed.* 2d 568; *Maryland Committee for Fair Representation v. Tawes*, 377 *U. S.* 656, 84 *S. Ct.* 1429, 12 *L. Ed.* 2d 595; *Davis v. Mann*, 377 *U. S.* 678, 84 *S. Ct.* 1441, 12 *L. Ed.* 2d 609; *Roman v. Sincock*, 377 *U. S.* 695, 84 *S. Ct.* 1449, 12 *L. Ed.* 2d 620; *Lucas v. Forty-Fourth General Assembly of Colorado*, 377 *U. S.* 713, 84 *S. Ct.* 1459, 12 *L. Ed.* 2d 632 (1964).

My rationalization proceeds in much the same fashion as does that of Justices Harlan and Stewart in their excellent and, to my mind, unanswerable dissents in *Reynolds v. Sims, supra,* and *WMCA, Inc. v. Lomenzo, supra,* respectively. Additionally, I base my conclusion upon the singular history of this State's legislative composition and the reasons which have undergirded that composition from early colonial days. My vote in favor of the constitutionality of our presently existing legislative scheme upon such grounds is precluded, however, by the generalization of the United States Supreme Court in *Reynolds, supra,* which prejudges a conclusion bottomed upon such an approach. The court there stated (377 *U. S.,* at *pp.* 579–580, 84 *S. Ct.,* at *p.* 1391, 12 *L. Ed. 2d,* at *pp.* 537–538) :

"But neither history alone, nor economic or other sorts of group interests, are permissible factors in attempting to justify disparities from population-based representation. Citizens, not history or economic interests, cast votes."

Accordingly, while I shall not repeat what has been said by Justices Harlan and Stewart, I shall briefly sketch the historical background out of which our present Legislature emerged and the reasons underlying the adoption of such a legislative device.

The province of New Jersey was included as part of a land grant to the Duke of York by Charles II in 1664 and the area now comprising New Jersey was almost immediately deeded by him to Lord Berkeley and Sir George Carteret. Although the legal right of these two proprietors to assume governmental authority was far from clear, they proceeded to draw up a constitution for the province in 1665. This document became known as "The Concessions and Agreements of the Lords Proprietors." It provided for a governor, a council of from six to twelve men appointed by the governor, and a general assembly composed of two deputies popularly elected by the freeholders of each town. The legislative council and assembly sat as two separate bodies, thus establishing the

bicameral system. Lord Berkeley sold his interest in the granted lands in 1674, and New Jersey was divided into the provinces of East Jersey and West Jersey, the boundary between the two being established by the famous Quintipartite Deed of July 1, 1676. The proprietors of West Jersey, a Quaker undertaking under the leadership of William Penn, formulated and adopted a document known as "The Concessions and Agreements of the Proprietors, Freeholders, and Inhabitants of West New Jersey in America," which provided that when the province had been divided into "tenths" there would be ten delegates from each subdivision elected by the proprietors, freeholders and inhabitants of each of the respective tenths. There was no provision for an upper house. The only limitations placed on this legislature were that all acts must be consonant with English law and must not conflict with the Concessions. Sir George Carteret, administrator of the province of East Jersey, died in 1680, and in 1682 his interest in East Jersey was purchased from his widow and eight trustees by William Penn and eleven associates. These twelve proprietors adopted the "Fundamental Concessions" under which the administration of public affairs was vested in 24 proprietors or their proxies and 144 representatives of the people. Although East Jersey was thus acquired by Quakers its population was and continued to be more heterogeneous than West Jersey, the European Quakers generally seeking refuge in West Jersey.

On April 17, 1702 Queen Anne accepted the voluntary surrender of the right of government by deed of the proprietors of East and West Jersey. The two Jerseys were thus reunited to form a single royal province with a single government. Queen Anne gave her "Instructions" to Lord Cornbury, governor of the colony, on November 16, 1702 for the establishment of a governmental system. The legislature consisted of the governor, a council appointed by the governor and drawn from East and West Jersey in equal numbers, and an Assembly of 24 members, 10 chosen at large from each division and two each from Perth Amboy and Burlington, the late capitals

of East and West Jersey respectively. The legislature met alternately in Perth Amboy and Burlington. After 1705 each of the then seven counties was allotted two assemblymen, as were the twin capitals and the town of Salem. With the creation of new counties as population expanded the composition of the assembly was altered. By 1775 there were 13 counties, each with two assemblymen and two members each from Burlington and Perth Amboy. The council continued as originally created. The reason for this sectional representation can be gleaned from the following account in *McCormick, New Jersey from Colony to State, pp.* 56–57 (1964) :

"It would be misleading to depict the Jerseys as one general community. In fact, there were sharp contrasts between East and West Jersey, contrasts which have not disappeared even today. The sources of settlement of the two provinces were quite distinct; each had its own government, its own proprietary land system. The fact that each had a separate existence for some three decades was not going to be erased instantly when the provinces were united in 1702. The population of East Jersey was much more varied than that of West Jersey. In the former province the people were compactly settled in townships, whereas in West Jersey the farms were widely dispersed. East Jersey was much more seriously divided by internal quarrels, arising out of the peculiar complexities of the dispute between the early townsmen, with their quit rent obligations, and the proprietors. There was no comparable source of contention in West Jersey. No small factor in emphasizing the cleavage between the two divisions was the growth of the cities of New York and Philadelphia, which rapidly drew within their respective orbits the adjacent sections of New Jersey. Certainly an important and continuing heritage from the proprietary period is the distinction that we presently observe between what we now call North Jersey and South Jersey."

This balancing of legislative power between the two divisions was bottomed upon the desire that neither should be able to force its will upon the other by the mere fortuity of numerical superiority—each division having enjoyed some degree of limited sovereignty before 1702, and being composed of peoples with differing economic interests, religious affiliations and national origins. Thus was established the precedent for legislative representation based upon territory as distinguished from population. This colonially-instituted mode of appor-

tionment has been perpetuated in the equal representation of counties in one house of the legislature under our State Constitutions of 1776, 1844 and 1947.

In May of 1776 the citizens of New Jersey elected delegates to the third Provincial Congress. The body convened at Burlington on June 10, 1776, and on June 21 of that year resolved to adopt a new Constitution — which was thereupon drafted and became effective on July 2, 1776. It is noteworthy that this was some eleven years before the adoption of the United States Constitution. New Jersey became the third colony to adopt a state constitution, and its new government was practically a replica of that of colonial days. The legislature consisted of two houses, all the members of which were elected annually. The upper house, known as the "Legislative Council," consisted of one member from each county. The lower house, designated the "General Assembly," consisted of three members from each county, with the proviso

"* * * that if a majority of the representatives of this province, in council and general assembly convened, shall, at any time or times hereafter, judge it equitable and proper to add to or diminish the number or proportion of the members of the assembly for any county or counties in this colony, then, and in such case, the same may, on the principles of more equal representation, be lawfully done, anything in this charter to the contrary notwithstanding; * * *."

Thus was re-established, this time in a written constitution, a bicameral legislature representative of political subdivisions, one house of which had one representative from each county, and the second a number depending upon the population of the several counties. Unfortunately, there are no records extant of the debates and discussions preceding the adoption of this article. However, it is recognized that the framers were much influenced by John Adams, who outlined his specifications for such a charter in correspondence with Jonathan Dickinson Sergeant, the principal author of our Constitution. In one of these letters Adams stated: "A single assembly is liable to all the vices, follies, and frailties of an individual * * *." *IV Adams, C. F., The Works of John Adams 202.*

That our citizens were alert to the effect of a bicameral legislature consisting of two houses representative of county and population, respectively, and intentionally continued that form of government is demonstrated by the many discussions which followed the adoption of the original Constitution. As early as 1799 William Griffith, writing under the pen name of *Eumenes,* published a series of articles

"Written for the purpose of exhibiting some of the more prominent errors and omissions of the Constitution of New Jersey . . . and to prove the necessity of calling a convention, for revision and amendment."

Many suggestions for change were made by him, including the manner of apportioning legislative representatives. He stated:

"The equal representation of the people, has been secured upon the *ratio,* either of *taxation* or *numbers.* Massachusetts, New York and Pennsylvania, have introduced a precise and invariable rule of apportionment, which adjusts itself by an easy application to every possible variation of the electoral body; and the people of New Jersey; will never be secure against partial and unjust deviation from the true principle of representation; namely, equal and determinate portions of the taxable inhabitants, until it is made an article of the general constitution. This is a fair, a rational, and practicable principle: if every district is represented in a *ratio* to its *taxable population,* no wrong is done; it is conformable to the acknowledged principles of legitimate government. True it is, that hitherto the people of New Jersey have not been represented in the legislature, according to their *constituent* capacity, but according to certain *geographical* descriptions; the *counties* have been represented by *equal* delegations, without regard to the comparative state of population and property. This is a gross violation of the first maxim of a republican, representative government, which dictates equality in the choice of those who are to make laws, and administer the public functions." *Id.,* at *p.* 53.

Influenced by these articles, the legislature authorized a referendum on the question of whether to call a constitutional convention. The people voted against a revision and thus rejected, *inter alia,* such a legislative change.

In 1827 an unofficial convention of prominent men from nine counties met in Trenton and produced a memorial asking the legislature to call a convention. The memorial never

came out of legislative committee. As stated by *Bebout, The Making of the New Jersey Constitution, p. XXXVIII:* "The truth seems to be that despite the words of editors, theorists and elder statesmen there never was an overwhelming demand on the part of the people for revision of the old constitution."

In 1844, pursuant to an act of the legislature, a constitutional convention was called. During the extensive debates upon the article providing for future amendment, the fear that the numerical majority of the population would overbear the minority to the latter's detriment was continually stressed. In the discussions on the creation of the legislature the principal controversy again concerned the protection of minorities. A proposal was made to divide the State into districts to consist of counties adjacent to each other and as nearly equal in population as possible, with each district being entitled to an equal number of senators. The debate upon this issue waxed acrimonious: the fear for the minorities again being stressed and emphasized. The suggestion was ultimately rejected by a vote of 37 to 15 in favor of a Senate composed of one senator from each county, with many delegates from populous sections joining in the vote against the defeated proposal and in favor of a provision which allotted one senator to each county and created a general assembly "* * * apportioned among the said counties as nearly as may be according to the number of their inhabitants. * * * provided, that each county shall at all times be entitled to one member; and the whole number of members shall never exceed sixty." *Constitution of 1844, Art. IV, Sec.* III(1).

In his annual message to the legislative session of 1873, Governor Joel Parker suggested the calling of a constitutional convention or commission. As a result, the legislature created a commission in 1873 which considered many proposed changes, one of which was the reorganization of the Senate on the basis of senatorial districts of equal population. Although the population of New Jersey had increased some two and a half fold between 1840 and 1870, largely in the urban centers, this suggested change was not adopted by the legislature. In

1875, however, 28 other suggested amendments were adopted by referendum.

Constitutional commissions were established in the years 1881, 1894 and 1905 but none of these resulted in a change of the legislative composition from that provided in the 1844 *Constitution*. In the decade of the 1940's the movement for constitutional revision flourished. Pursuant to *L*. 1941, *J. Res.* 2, a "Commission on Revision of the New Jersey Constitution" was appointed. This Commission prepared a draft of a new Constitution which was submitted to the legislature with the suggestion that the draft be submitted to the people as a whole. Again, the legislative article remained as it was written in the *Constitution of* 1844. The proposed revision was referred to a joint committee of the Senate and General Assembly which held public hearings to ascertain public sentiment on the proposal. A majority of the joint committee recommended that "no action for change in the New Jersey Constitution be taken until after the termination of the present war." By *L*. 1943, *c*. 217, the legislature, however, authorized a referendum upon the question:

"Shall the one hundred sixty-eighth Legislature be authorized to agree, by a majority of the members elected to each of the two houses, upon a revised Constitution for the State, which revised Constitution shall include the provisions of Article I of the present Constitution, commonly known as 'The Bill of Rights,' and shall include provision for a Senate composed of one Senator from each county and a General Assembly composed of not more than sixty members apportioned among the counties as provided by the present Constitution so that each county shall at all times be entitled to one member, and to submit the same as a whole and in such manner as said Legislature shall prescribe to the people, for their approval and ratification or rejection as a whole, at the general election to be held in the year one thousand nine hundred and forty-four?"

The electorate voted favorably, and in accordance with this mandate the revised instrument was submitted at the election of November 7, 1944 but was rejected by the electorate. Although public pre-election opposition was directed at a number of facets of the proposed instrument, there was practically

no objection to the legislative section. It is generally conceded that this provision played no part in the vote for rejection.

By *L.* 1947, *c.* 8, a Constitutional Convention was again authorized. This statute provided in part:

"The constitutional convention shall prepare and agree upon a new State Constitution, revising, altering or reforming the present Constitution in such part or parts and in such manner as the convention shall deem in the public interest; *provided, however,* that the convention in no event agree upon, propose or submit to vote of the people, either separately or included among other provisions, any provision for change in the present territorial limits of the respective counties, or any provision for legislative representation other than provision for a Senate composed of one Senator from each county and a General Assembly composed of not more than sixty members apportioned among the counties according to population so that each county shall at all times be entitled to at least one member, chosen for, and elected by the legal voters of, the respective counties."

The Convention prepared a new Constitution which was adopted by a referendum on November 4, 1947.

It has been argued that the 1947 referendum is not truly demonstrative of a preference by the electorate for a bicameral legislature as presently composed because of the restriction statutorily imposed upon the Convention. The fact remains, however, that the voters of the entire State, including those of the metropolitan areas, did approve this system in that year when they were free, if sentiment was opposed thereto, to reject the entire instrument as they did in 1944 because of objections to other individual provisions.

Thus it is seen that from early colonial days New Jersey has had a legislative body comparable in form to that now being attacked. From 1776 (eleven years before the adoption of the United States Constitution) to 1947, the citizens of New Jersey have continued to approve and to repulse attacks upon a bicameral legislature, one house of which is apportioned to the several counties regardless of their individual population, and the other to the several counties proportionally to their individual population. The roots of this form of government are planted in the differences in the colonial prov-

inces of East and West Jersey, each to a great extent having at one time been sovereign entities. Such a form of government was stimulated by the desire to protect the rights and interests of minorities, whether they be doctrinal, religious, economic or territorial, and so to prevent control of government by force of numbers. The policy so born has continued for 188 years. Nor have the sound reasons for a two-house legislature diminished with the passage of time. The deleterious impact of the equalitarian principle of "one man one vote" as pronounced by the United States Supreme Court, which concerned our citizens in the early days of statehood, is as viable today as then.

The reasons for the protection of minorities against the overpowering and ofttimes hasty and ill-considered actions of the majority continue to have vitality. Metropolitan, and more recently suburban, populations have increased more rapidly than the rural populations. In the latter sections, consisting of separate counties, the economic life of the community revolves around agriculture, fishing and resort activities—each one of which contributes substantial and important incomes to the State. The problems of these divisions requiring legislative attention are frequently entirely different and sometimes antagonistic to those of the metropolitan and suburban sections where commerce, industry and finance are of primary concern. Nor are the requisites of municipal and county control identical. The United States Supreme Court has expressed the concern in *Reynolds v. Sims, supra,* 377 *U. S.,* at *p.* 576, 84 *S. Ct.,* at *p.* 1389, 12 *L. Ed. 2d,* at *pp.* 535–536, that:

"Deadlock between the two bodies might result in compromise and concession on some issues. But in all too many cases the more probable result would be frustration of the majority will through minority veto in the house not apportioned on a population basis, stemming directly from the failure to accord adequate overall legislative representation to all of the State's citizens on a nondiscriminatory basis."

Although we have had similar generalized statements presented on oral argument in the matter *sub judice,* counsel has failed to specify particular instances. To my knowledge, our system has not resulted in frustration of worthwhile state-wide measures by small county legislators acting by and for themselves. However, if this argument has substance it is as applicable to the federal system which was patterned after the New Jersey *Constitution of* 1776. Surely it cannot be said that the federal system is at an impasse, or that compromise and concession are not there important stabilizing influences.

Who is to say that so-called "frustration of the majority" is not justice for the minority—who is to say that a given measure of state-wide concern is or was defeated solely because of the objection of a minority in the Legislature which does not represent a majority of voters in the State at large—or who is to determine that the "majority will" is beneficial for the State at large?

The fallacy with the proposition that legislation desired by the legislators representing the more populous sections is representative of the will of a majority of the public of the State is that it does not follow that such legislators express the will of a combination of the minority in their own election districts and those of similar views residing in the less populous areas. The combination of the latter could well total a state-wide majority, and it is possible for a legislative majority to actually express the sentiments of a state-wide minority.

In *Reynolds, supra,* 377 *U. S.,* at *p.* 565, 84 *S. Ct.,* at *p.* 1383, 12 *L. Ed. 2d,* at *p.* 529, the court stated:

"Logically, in a society ostensibly grounded on representative government, it would seem reasonable that a majority of the people of a State could elect a majority of that State's legislators. To conclude differently, and to sanction minority control of state legislative bodies, would appear to deny majority rights in a way that far surpasses any possible denial of minority rights that might otherwise be thought to result."

With the premise itself there can be no dispute, nor in fact is the conclusion, as stated, subject to reasonable debate. How-

ever, to conclude that the Senate in our State has absolute control of the legislative process is to ignore the potency of the Assembly elected on a proportional basis and theoretically representative of a majority of the public. To deny the less populated counties, whose problems are dissimilar to those of the more populous counties, the braking effect of a bicameral legislature is in effect to create a unicameral legislature elected by the public at large.

To say that ours is a representative government is not to say that minorities should be subjected to the possible tyrannical will of a majority nor that protection against such a contingency is not an important requisite of such government.

Personal experience in the House of Assembly has demonstrated to me the preoccupation of legislators from more populous sections with their problems at the expense and sometimes in utter disregard of the serious concerns of the less populous areas. But for the restraining effect of the Senate this would frequently have resulted in a complete frustration of the minority. Surely the danger to the rights of minorities which is inherent in such a system surpasses the partial restraint imposed on the will of the majority. Any other conclusion ignores the fact that "a citizen, a qualified voter, is no more nor no less so because he lives in the city or on the farm," *Reynolds, supra,* 377 *U. S.,* at p. 568, 84 *S. Ct.,* at p. 1384, 12 *L. Ed. 2d,* at p. 531, since that minority would not receive any meaningful representation and thus be deprived of any voice in government.

The legislative composition of New Jersey had its genesis eleven years before the adoption of the United States Constitution. The provinces of East and West Jersey enjoyed a limited degree of sovereignty before 1702, as did the counties thereafter. New Jersey was admittedly a sovereign state when it joined in the compact of 1787 and surely did not then agree even implicitly to abandon its legislative composition, a composition after which the United States Constitution was itself patterned. The entire State has continued to flourish under the present legislative distribution.

It is impossible to conclude that had the Fourteenth Amendment been understood to make our legislative body unconstitutional, the advocates of proportional senatorial districts (who were so vocal in the Convention of 1844) would not have, subsequent to 1868, urged this as a ground for constitutional revision. Nor is it conceivable that this same thesis would not have been advanced to the constitutional revision commission of 1873 by proponents of proportional Senate representation. The fact that this basis was not argued by the many brilliant minds of this State interested in constitutional revision over the span of 79 years between 1868 and 1947 demonstrates that the construction of the Fourteenth Amendment now adopted is in reality an extension never intended. The Constitution of this State has now in effect been amended without the consent of its citizens, in a manner not provided by our Constitution but rather by a judicial fiat of the United States Supreme Court—and this by a construction inconsistent with history, logic, republican principles and the sovereignty of our State.

*For reversal* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.