AMERICAN TRIAL LAWYERS ASSOCIATION, NEW JERSEY BRANCH, TRIAL ATTORNEYS OF NEW JERSEY AND TRIAL LAWYERS ASSOCIATION OF MIDDLESEX COUNTY, INDIVIDUALLY AND AS CLASS REPRESENTATIVES OF MEMBERS OF THE PLAINTIFF ORGANIZATIONS, WHICH CLASSES ARE ALSO: PLAINTIFFS-APPELLANTS, v. NEW JERSEY SUPREME COURT, DEFENDANT-RESPONDENT.

Argued October 21, 1974—Decided December 17, 1974.

*Mr. Morris M. Schnitzer* and *Mr. William O. Barnes, Jr.* argued the cause for the appellants (*Messrs. Schnitzer and Schnitzer* and *Mr. William O. Barnes, Jr.* attorneys; *Mr. Alexander M. Bickel* on the brief).

*Mr. Stephen Skillman,* Assistant Attorney General, argued the cause for respondent (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

HUGHES, C. J. This litigation challenges the authority of the Supreme Court under its rule-making power, *N. J. Const.* (1947), Art. VI, § II, par. 3,[1] to establish a graduated schedule of maximum contingent fees applicable to certain tort litigation conducted by New Jersey attorneys. It thus suggests to the Court an introspective look at its constitutional power to regulate the practice of law as well as its consequent responsibilities in that regard.

---

[1] *N. J. Const.* (1947), Art. VI, § II, par. 3, reads:

3. The Supreme Court shall make rules governing the administration of all courts in the State and, subject to law, the practice and procedure in all such courts. The Supreme Court shall have jurisdiction over the admission to the practice of law and the discipline of persons admitted.

The contingent fee rule, *R.* 1:21–7, was adopted by this Court[2] in December 1971, to be effective January 31, 1972. Its limitation clause (c)[3] was promptly challenged on federal and state constitutional grounds by litigation instituted by several highly respected associations of trial lawyers (hereafter "plaintiffs"). Plaintiffs may be considered, *arguendo,* to be representative of a class, namely the entire New Jersey trial bar; we are not so clear as to their standing to represent the poor,[4] but that is not necessary to decide now. The initial attack on the rule was spelled out in complaints filed in the United States District Court, seeking declaratory and injunctive relief. There was convened, under 28 *U. S. C.* §§ 2281, 2284, a three-judge court which

---

[2]The 1971 Court included, *inter alia*, Chief Justice Weintraub (who in the progressive tradition of the late Chief Justice Vanderbilt, had dedicated himself fully to a leadership role of this Court in fulfilling its constitutional responsibilities toward the better administration of justice) and several other Justices also since retired (Francis, J., Proctor, J., Schettino, J.) who participated with him in that process.

[3]*R.* 1:21–7(c) reads:

(c) In any matter where a client's claim for damages is based upon the alleged tortious conduct of another, including products liability claims, and the client is not a subrogee, an attorney shall not contract for, charge, or collect a contingent fee in excess of the following limits:

(1)  50% on the first $1000 recovered;
(2)  40% on the next $2000 recovered;
(3)  33-1/3% on the next $47,000 recovered;
(4)  20% on the next $50,000 recovered;
(5)  10% on any amount recovered over $100,000; and
(6)  where the amount recovered is for the benefit of an infant or incompetent and the matter is settled without trial the foregoing limits shall apply, except that the fee on any amount recovered up to $50,000 shall not exceed 25%.

[4]Legal service to the poor is frequently available only through the contingent fee device (defined by the rule as "an agreement for legal services of an attorney * * * under which compensation, contingent in whole or in part upon * * * successful accomplishment * * * is to be in an amount which either is fixed or is to be determined under a formula.") and any limitation thereon is said to carry with it an invidious reduction in the scope or delivery of such service.

dismissed the cause on grounds of abstention, *Reetz v. Bozanich,* 397 *U. S.* 82, 90 *S. Ct.* 788, 25 *L. Ed.* 2d 68 (1970). On appeal the United States Supreme Court vacated that judgment, ordering the District Court to retain jurisdiction pending conclusion of proceedings in the state courts. *American Trial Lawyers Ass'n v. New Jersey Supreme Court,* 409 *U. S.* 467, 93 *S. Ct.* 627, 34 *L. Ed.* 2d 651 (1973).

The state court litigation has a procedural history not particularly important here, except to recall that, proceeding summarily under *R.* 4:67–5, the Superior Court, Law Division, in an unreported opinion, held *R.* 1:21–7(c) to be invalid. (Docket No. L–16981–72, filed July 5, 1973). It rested that judgment on state constitutional grounds, interference by the rule with freedom of contract and absence of apparent justification therefor in the record. It deemed freedom of contract, including that between attorney and client as to contingent fees, to be constitutionally protected as a basic liberty, subject only to the exercise of the police power.

The Appellate Division reversed and in a comprehensive opinion determined that the adoption of the rule, fixing outer limits on contingent fees, not only was constitutionally unassailable, but clearly came within the ambit of this Court's responsibility to regulate relationships between Bar and public. *American Trial Lawyers Ass'n v. New Jersey Supreme Court,* 126 *N. J. Super.* 577 (1974). We adopt this well-reasoned opinion *in toto,* and ordinarily would end by saying so.

However, some few observations might be useful, touching on the basis of the Court's constitutional power and responsibility.

In 1947, the people of New Jersey adopted a new Constitution to replace that of 1844 (the successor to the Revolutionary Constitution of 1776), recognizing that over the span of that century-plus the state had emerged from its largely agricultural past to become a more complex component of the American community. Heavily industrialized, congested by

dynamic population and business growth, suffering the pains of unprecedented and largely unplanned urbanization, criss-crossed by the travel of millions of visitors or transients, choked by an archaic tax system, New Jersey had become, in the words of Woodrow Wilson (who served as its Governor part way through that interval) a kind of "laboratory" of the nation's problems and its hopes.

By Article VI of the 1947 Constitution, the people discarded the former court system, attenuated and overburdened as it was by the developments and complexities of the years. The new charter had at its core the creation of a modern system of courts. That court system, in its political independence, its design of administrative self-government, its hoped-for efficiency and consequent productivity potential in the public interest since has come to be regarded as something of a model by other jurisdictions. W. J. Brennan, Jr., *After Eight Years: New Jersey Judicial Reform*, 43 *A. B. A. J.* 499 (1957); M. Pirsig, *The Proposed Amendment of the Judiciary Article of the Minnesota Constitution*, 40 *Minn. L. Rev.* 815, 823–24 (1956); R. Pound, *Procedure Under Rules of Court in New Jersey*, 66 *Harv. L. Rev.* 28 (1952). Central to this system was a unique administrative flexibility, largely accommodated by the rule-making power, soon to be vindicated (in the context of procedural and practice, vis-a-vis substantive, matters) in *Winberry v. Salisbury*, 5 *N. J.* 240 (1950), *cert.* den. 340 *U. S.* 877, 71 *S. Ct.* 123, 95 *L. Ed.* 638 (1950).

In this context, then, we come to the basic question of this case: What is the nature and extent of the Court's regulatory power over those who practice law?

One source of the power of the Court to regulate practice and procedure therein, of course, is its traditional, inherent and integral relationship to the very existence and the functioning of the court. But so precisely and unmistakably (as held below) did Article VI, § II, par. 3 of the Constitution, *supra,* make "the Supreme Court the exclusive repository of the State's power to regulate the practice of the law, invest-

ing it 'with exclusive responsibility in this area' *State v. Rush,* 46 *N. J.* 399, 411 (1966)," *American Trial Lawyers Ass'n v. New Jersey Supreme Court, supra,* 126 *N. J. Super.* at 585, that the existence and exclusivity of the power would seem quite beyond question.

As to its nature: we must remember that there is a manifest conceptual kinship between "power" as such, and the obligation for responsible use of that power, and that, never from a myopic viewpoint, but fully and truly in the public interest. The people's constitutional reposition of power always carries with it a mandate for the full and responsible use of that power. When the organic law reposes legislative power in that branch, for instance, it is expected that such power will be used, lest it wither and leave the vacuum of a constitutional exigency, requiring another branch (however reluctantly) to exercise, or project the exercise of, that unused power for the necessary vindication of the constitutional rights of the people. *Robinson v. Cahill,* 62 *N. J.* 473 (1973), cert. den. *sub nom. Dickey v. Robinson,* 414 *U. S.* 976, 94 *S. Ct.* 292, 38 *L. Ed.* 2d 219; *Jackman v. Bodine,* 43 *N. J.* 453 (1964); *Asbury Park Press, Inc. v. Woolley,* 33 *N. J.* 1 (1960). So it is with the unparalleled executive authority vested by the 1947 Constitution.

And so it has been with the judicial branch of this government. Since 1948 (the Judicial Article became effective September 15, 1948, Article XI, § IV, par. 14) the Supreme Court has not hesitated to meet its responsibility for the use of the judicial and administrative power reposed in it by Article VI. Thus, it has "legislatively" adopted Rules of general application regulating the professional conduct of attorneys and their relationships to their clients and to the courts. The wide range of such rules was noted by the Appellate Division.[5]

---

[5]"* * * rules: regulating bar examinations and the licensing of attorneys (*R.* 1:23 to 27); specifying who may practice law and appear in court (*R.* 1:21–1 to 4); authorizing attorneys to form

264

Nor has the judiciary forgotten to regulate the conduct of its own members, as by our adoption of the Code of Judicial Conduct and our creation of an Advisory Committee on Judicial Conduct to aid in its enforcement. *R.* 2 :15–1, *et seq.*

In their able brief, plaintiffs suggest that the nature and reach of the disciplinary power are of "first, critical importance," and we agree. We are also quite clear that the people, in their constitutional grant of the power of superintendence of those admitted to practice law, did not express a mere gesture or formality. On the contrary, we think they intended that responsibility to extend to every area in which unjust or unethical conduct might afflict the public at the hands of those admitted by the Court to the practice of the law. We believe the people intended that the Court should cope as best it might with interstices, wherever they appear, in the pattern of honest and ethical practice of the law. In this grant of power and reposing of responsibility the people of New Jersey trusted and commissioned the Supreme Court, in effect, to "keep the house of the law in order." *See, Gair v. Peck,* 6 *N. Y.* 2d 97, 111, 188 *N. Y. S.* 2d 491, 502, 160 *N. E.* 2d 43, 51 (1959), *appeal dismissed* 361 *U. S.* 374, 80 *S. Ct.* 401, 4 *L. Ed.* 2d 380 (1960). The Court intends to fulfill that responsibility, and to fulfill it within the framework of constitutional right.[6] To do less

'professional corporations' to engage in the practice of the law (*R.* 1 :21–1A) ; creating a committee on the unauthorized practice of the law (*R.* 1 :22) ; setting forth limitations on the practice of law by attorneys holding various public offices and positions (*R.* 1 :15) ; adopting a canon of professional ethics (*R.* 1 :14) ; creating an advisory committee on professional ethics (*R.* 1 :19) ; regulating ethics committees and disciplinary proceedings (*R.* 1 :20) ; requiring attorneys to maintain separate trustee and business bank accounts and specified bookkeeping records (*R.* 1 :21–6), and providing for the creation and maintenance of a 'client's security fund' to which each member of the bar must annually contribute the sum of $15 (*R.* 1 :28)." [126 *N. J. Super.* at 584–585]

would degrade the Court, weaken the profession and impede the administration of justice, eventualities against which we believe the profession, as well as this Court, to be fully dedicated.

Plaintiffs argue that in its adoption of *R.* 1:21–7(c) the Court acted, not in a legislative but in an adjudicatory role, and that an evidentiary hearing should have preceded and justified its action. Again, we think the constitutional grant of power and lodgement of responsibility were not so limited. For instance, the people surely did not intend that the court would require an evidentiary hearing to prove to itself the wrongness and danger of an attorney commingling his personal funds and those entrusted to his care by his client, before it could have guarded against that evil by its adoption of *R.* 1:21–6, *supra,* n. 5. Nor can it be that an evidentiary hearing would be needed to justify the fairness and reasonableness of the factors listed in DR 2–106.[7]

---

6The trial court commented that "the rule making power as applied to the admission and discipline of attorneys is not unbridled." Our Court has never indulged such an illusion. We agree with the learned court below that the power is measured by the federal and state constitutions, to which all, attorneys and judges alike, owe fealty.

7DR 2–106 Fees for Legal Services.
(A) A lawyer should charge no more than a reasonable fee. A fee is excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following:
  (1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.
  (2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.
  (3) The fee customarily charged in the locality for similar legal services.
  (4) The amount involved and the results obtained.
  (5) The time limitations imposed by the client or by the circumstances.

To adopt the view suggested would seem quite illogical, as though the people intended to vest responsibility for superintendence of the ethical practice of the law, yet to withhold from the Court the power to make rules to effectuate that very superintendence.

Without further examples, we may concede at once that the rule here discussed was not bottomed on an evidentiary hearing, nor even on anything approaching the lengthy investigation by Justice Wasservogel to reveal the abuse of the contingent fee system in New York. That scrutiny preceded the adoption there of the control rule later held valid by decision of the Court of Appeals in *Gair v. Peck, supra*. It is unrealistic to suppose that cupidity and overreaching end at the banks of the Hudson, and we do not indulge that aberration. Our Supreme Court, as the natural recipient of clients' complaints against the conduct of lawyers, has accumulated experience over the years, as briefly mentioned by Chief Justice Weintraub at the November 6, 1971 hearing.[8] This, of course, absent documentation and hearing, could not constitute an evidentiary hearing in the adjudicatory sense. But for the reasons mentioned above, and as carefully explicated by the Appellate Division, we are quite clear that such an evidentiary hearing was not constitutionally required.

---

   (6)  The nature and length of the professional relationship wtih the client.

   (7)  The experience, reputation, and ability of the lawyer or lawyers performing the services.

   (8)  Whether the fee is fixed or contingent.

(B) At the request of a client, a lawyer shall submit a fee dispute to the local ethics committee for resolution.

(C) A lawyer shall not enter into an arrangement for, charge, or collect a fee for representing a defendant in a criminal case which is substantially contingent upon the result.

(D) A lawyer shall be disciplined if he shall enter into an agreement for, charge, or collect a fee so excessive as to evidence an intent to overreach his client.

[8]At an open meeting of the Court with representatives of the Bar to elicit views as to the adoption of the rule.

267

Too, it is proposed that the Court has adjudicatory power to discipline a lawyer who violates DR 2–106, overreaching his client unconscionably, even to the extent of disbarment of the attorney, and that this suffices to discharge its constitutional responsibility. But it would appear to require some implementation of this power to reach the otherwise unreported and undiscovered violation. Whatever the enormity or frequency or rarity of such concealed offenses, it is the obligation of the Court to try to prevent them.

We conclude with a word of cautionary explanation. Both this opinion and that of the Appellate Division, here adopted, are carefully confined to the discussion and resolution of two issues: whether this Court possessed the power to adopt *R.* 1:21–7 and whether it had the right to do so without first holding an evidentiary hearing. As has been indicated, we have no doubt that the power exists and are equally certain that its exercise need not be conditioned upon or accompanied by such a hearing. The Court remains extremely mindful of the abuse this regulation seeks to control and of the Court's constitutional responsibility in this regard. But whether *R.* 1:21–7 should continue as an on-going rule of court, whether it should be modified or whether it should be repealed and the problem attacked in some other way are matters to which this decision has not addressed itself. Our rules are never immutable. Applications for their review are never foreclosed. *In re NBC,* 64 *N. J.* 476 (1974). The Court does not adopt its rules to promote or brook injustice but, as best it can, to secure justice, and justice under Constitution and law.

Affirmed.

*For affirmance*—Chief Justice HUGHES, and Justices JACOBS, HALL, MOUNTAIN, SULLIVAN, PASHMAN and CLIFFORD—7.

*For reversal*—None.