Ken **DAVIS, D.C. et al., Plaintiff,**

v.

**BOARD OF MEDICAL EXAMINERS,**
**Defendant.**

Civ. No. 80–1864.

United States District Court,
D. New Jersey.

Sept. 23, 1980.

---

Smith, Don & Alampi by Berek P. Don, Englewood Cliffs, N.J., for plaintiffs; Dowell, McNearney, Desselle & Calton, Independence, Mo., on the brief.[1]

John J. Degnan, Atty. Gen. of New Jersey, Trenton, N.J., by Douglas J. Harper, Deputy Atty. Gen., Newark, N.J., for defendant.

## OPINION

BIUNNO, District Judge.

This suit, which is before the court on motion for preliminary injunction, is brought to challenge the validity of N.J. S.A. 45:9–18, as amended by N.J.P.L.1977, c. 380, and the regulation adopted under the authority of N.J.S.A. 45:9–2, found at N.J. A.C. 13:35–6.13, adopted to take effect April 14, 1978. Declaratory judgment, injunction, money damages and attorneys fees are sought. Jurisdiction is asserted under 28 U.S.C. §§ 1331, 1343(3) and 1343(4).

The challenge presents two grounds. One is that these laws and regulations violate the First Amendment guarantee of free speech, which is made applicable to the States through the due process clause of the Fourteenth Amendment, see *Schneider v. State*, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939); *Bigelow v. Virginia*, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975).

The second is that the law and regulations are too vague and indefinite, such as to fail to give fair notice and due warning,

---

1. The Missouri law firm is noted only because its name is on the brief. However, no application for leave to appear pro hac vice was made, General Rule 4 of this District. On the return date of the motion for preliminary injunction, no one appeared to argue it, and it was carried to the next date. On the adjourned date, no one appeared to argue the motion and the court ordered it decided under F.R.Civ.P. 78.

thus constituting a deprivation of due process guaranteed by the Fourteenth Amendment. Presumably, this aspect could involve the question whether the prohibited conduct is specifically defined by applicable State law as written or authoritatively construed by applicable precedents, *Miller v. California*, 413 U.S. 15, at 24, 93 S.Ct. 2607, at 2614–2615, 37 L.Ed.2d 419 (1973).

 Plaintiffs are licensed to engage in the practice of chiropractic, and so are subject to regulation by the State, the function having been assigned to the N.J. State Board of Medical Examiners. No issue is raised or claim made, as the court understands the case, in respect to the State's authority to regulate the practice of chiropractic, see *Semler v. Dental Examiners*, 294 U.S. 608, 55 S.Ct. 570, 79 L.Ed. 1086 (1935); *Williamson v. Lee Optical Co.*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); *Abelson's Inc. v. N.J. State Board of Optometrists*, 5 N.J. 412, 75 A.2d 867 (1950); *Head v. New Mexico Board*, 374 U.S. 424, 83 S.Ct. 1759, 10 L.Ed.2d 983 (1963). Rather, the issues are much narrower.

The free speech or First Amendment claims rest mainly on two recent decisions dealing with the subject. These are *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) dealing with newspaper publication by pharmacists of their retail prices for prepackaged prescription drugs; and *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), dealing with newspaper publication by lawyers of their fees for which particular "routine services" would be performed.

In both those cases, the challenged enactments were complete prohibitions against advertising by the regulated professional, operating indirectly through application of the disciplinary process to them. The enactments, there, as here, did not extend to unregulated activities as in the case of the obscenity law in *Miller*, supra.

It should be observed, too, that New Jersey's Constitution also contains a free speech and free press guaranty, as follows:

"Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press." *N.J.Const.* 1844, Art. 1, par. 5; *N.J.Const.* 1947, Art. 1, par. 6;

 To the extent that this provision, as construed by New Jersey, provides less protection than the First Amendment, the latter must prevail as paramount law under the supremacy clause, *U.S.Const.* Art. VI, cl. 2. To the extent that this provision extends greater protection than all that the First Amendment does, the additional scope is a matter of State rather than federal law, and the State is free to take that course. See, *Cooper v. California*, 386 U.S. 58, at 62, 87 S.Ct. 788, at 791, 17 L.Ed.2d 730 (1968); *PruneYard, etc. v. Robins*, —— U.S. ——, at ——, 100 S.Ct. 2035, at 2040, 64 L.Ed.2d 741 (1980).

The *Virginia* and *Bates* decisions made it clear that since regulated professions were involved, neither one purported to forbid the regulation of commercial speech by professionals. In *Virginia*, for example, the court said:

"In concluding that commercial speech, like other varieties, is protected, we of course do not hold that it can never be regulated in any way". 425 U.S. at 770, 96 S.Ct. at 1830.

In *Bates*, for another example, the court said:

"In holding that advertising by attorneys may not be subjected to blanket suppression, and that the advertisement at issue is protected, we, of course, do not hold that advertising by attorneys may not be regulated in any way." 433 U.S. at 383, 97 S.Ct. at 2708.

To be sure, there was sharp disagreement with the majority's view that permissible regulation of professional commercial speech posed no particular problem. See the dissents on this point in *Bates*, by Chief Justice Burger, 433 U.S. at 386, 97 S.Ct. at 2710 and Mr. Justice Powell, 433 U.S. at 389, 97 S.Ct. at 2711–2712, joined by Mr. Justice Stewart.

More significant, however, is the observation of Mr. Justice Rehnquist, 433 U.S. at 404, 405, 97 S.Ct. at 2719, that the Court's opinion in *Bates* "offers very little guidance as to the extent or nature of permissible state regulation of professions such as law or medicine." Once the *Virginia Board* case abandoned the First Amendment exception of commercial speech, the first step was taken on a "slippery slope" which foreordains a shift to case–by–case adjudication. No line has been drawn, and none can be until a sufficient number of points in that line have been marked, established and located through the process of case–by–case adjudication.

Regulation of professions and occupations has, from the beginning, been a matter to be dealt with by the several States, coming within the scope of powers reserved to the States under *U.S. Const.*, Amend. X. This historical and legal background is so well known that neither *Virginia Pharmacy* nor *Bates* saw any need to discuss it in this sense. Yet, in confirming that neither decision blocks State authority to regulate, both decisions recognize it, even in the field of advertising or other commercial speech.

Both *Virginia Pharmacy* and *Bates*, of course, were decided on the basis of specific newspaper publications, one announcing prices for particular prescription drugs, and the other indicating the fee for "routine services" of a limited kind and number. Both cases emphasize that the ruling is a narrow one. Both cases were decided in the context of a trial record conceived to be adequate for that narrow issue.

In this case, there is no factual record and no context. The motion for preliminary injunction is unsupported by any affidavit to establish the factual basis for this extraordinary remedy. Nowhere in the complaint, in the moving papers or in the brief is there the slightest indication of what it is that plaintiffs seek to publish and how the New Jersey law and regulation bar it.

 The eight–page memorandum is quite inadequate, failing as it does to distinguish between general speech and commercial speech. It utterly disregards what was said in *Bates*, 433 U.S. at 379–381, 97 S.Ct. at 2706–2708, to the effect that the "overbreadth" doctrine, itself a departure from the traditional rule, would not be applied in a commercial speech case. Thus, not only are plaintiffs obliged to establish overbreadth; they must go further and demonstrate that their specific conduct is protected. They must hew to the traditional rule. They may not rest their challenge on the ground that the statute and regulation "might be" applied unconstitutionally in circumstances other than those before the court.

The memorandum also fails to present any analysis of New Jersey law and regulations on the subject before and after *Virginia Pharmacy* and *Bates*. The most meager research discloses that both the challenged statute and the regulation were amended after those decisions were announced, implying that the Legislature and the Board were aware of the decisions, responded to them, and exercised the regulatory authority which both decisions recognize. Yet, this subject is nowhere discussed or any analysis presented.

It may be that, as the result of *Virginia Pharmacy* and *Bates*, the various professions may have a First Amendment commercial speech right to publish newspaper announcements of their prices for prepackaged goods and for "routine services". That, however, does not serve to convert a court into a supermarket where a plaintiff can enter, select the kind of order he wishes from the shelves, and take it with him through the checkout counter. There is always at least one other party, with other interests to be heard and considered. The applicant must overcome the opposition and carry the burden.

Nothing is presented to display the pattern of regulatory activity in New Jersey since *Virginia Pharmacy* and *Bates* in related fields. Thus, the Supreme Court of New Jersey, which has the duty to regulate the practice of law, has modified Disciplinary Rules DR 2–101, DR 2–102, DR 2–103, DR 2–104 and DR 2–105 as recently as 1979, in the light of these two decisions. As anoth-

er example, the N.J. State Board of Dentistry adopted a revised regulation on the subject, N.J.A.C. 13:30–8.6, in 1978, for the same reason. No doubt there are others.

Of course, it is likely to be the case that a given kind of item may be protected commercial speech for one profession but not for another. In *Virginia Pharmacy* the court took pains to note that:

"Although we express no opinion as to other professions, the distinctions, historical and functional, between professions, may require considerations of quite different factors." 425 U.S. at 773, footnote 25, 96 S.Ct. at 1831, footnote 25.

Yet, the memorandum makes no attempt to analyze this thorny and unexplored thicket, a veritable bramble bush.

If this case involved publications by lawyers, the court might have some confidence and awareness of the subtle and complex factors involved, in the light of more than 40 years at law. It would know that the list of "routine services" involved in *Bates* can present some serious problems in the real world, such as the item: "Divorce or legal separation—uncontested (both spouses sign papers)", which does not say whether the specified fee is the fee for each spouse or for both, or what the fee will be if one spouse chooses to have independent advice, or how the lawyer will resolve the hurdle of conflict of interest, one of the most vital concepts in the regulatory array for lawyers.

It would know that the great bulk of legal matters for the ordinary citizen deals with motor vehicle tickets, automobile accidents, housing contracts (leases or purchases), workers' compensation claims, employer–employee relations, purchases of goods, taxes, and the like, and that very little demand exists for adoptions, personal bankruptcies or change of name, by comparison. Is the listing of these items intended as a loss–leader, and so a form of solicitation? If any of them should involve an unexpected obstacle, does the advertised fee hold, or is there an add–on? Would it satisfy the standards of SEC Rule 10b–5?

Another aspect, not discussed by either *Virginia Pharmacy* or *Bates* is the matter of protection of the client or patient by the practitioner's professional malpractice insurance. In allowing lawyers to practice as professional corporations, the Supreme Court of New Jersey was careful to protect the public by requiring professional liability insurance in significant amounts, see N.J. Court Rule R. 1:21–1A. It has also established a pioneering Clients' Security Fund to provide a means for reimbursement of losses caused by a dishonest lawyer, N.J. Court Rule R. 1:28. As all who read the papers know, the medical profession has faced such massive increases in premiums as to lead it to form its own company to provide professional liability insurance.

If lawyers and health practitioners engage in publication of fees, services and the like, will a member of the public be protected by the insurance, or the security fund, for a claim grounded on the publication but not on professional malpractice? These are serious and difficult questions, not only for the regulatory agencies and the courts, but also for the practitioners who engage in commercial speech. They will be engaging in an activity for which their insurance may not provide coverage.

In the case here, the subject is the practice of chiropractic, which, as the court understands it, involves methods for the treatment of diseases by manipulation of the spine. No prescriptions may be written. In this respect it differs from osteopathy and medicine, see *Falcone v. Middlesex County, etc.*, 34 N.J. 582, 170 A.2d 791 (1961). The court has no general familiarity with the field, and so would be wholly unable to act with confidence on the present record even if it included the graphics for the particular information the plaintiffs wish to publish and which they fear may give rise to disciplinary proceedings leading to some sanction, including suspension or revocation of license. The court is unable to prepare the graphics or text for them, and even if it could that is not a judicial function.

■ Thus, not only is this a case where preliminary injunction must be denied for failure to present a factual record essential to support the crucial findings which are the predicate of the remedy sought, but it is a clear case calling for application of the principle of *Railroad Comm'rs v. Pullman*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

■ The *Pullman* doctrine is uniquely appropriate in a case of this kind because the sole jurisdiction to regulate the profession, including commercial speech by members of the health professions, is in the State, through its agencies and courts. Plaintiffs have a variety of routes available to them by which they can know with confidence that a specific publication will not expose them to the risk of disciplinary action.

■ In *Bates*, for example, the lawyers were found to have published the ad "in good faith to test the constitutionality of DR 2–101B", and the Arizona court reduced the sanction to censure only, see 433 U.S. at 358, 97 S.Ct. at 2696. In New Jersey, it is not necessary to take such a risk of being wrong in order to test a statute, a rule or regulation, or an ordinance. New Jersey's Declaratory Judgment Act, N.J.S.A. 2A:16–50, et seq., has long provided a civilized means by which a person, "whose rights, status or other legal relations are affected by a statute * * * may have determined any question of construction or validity arising under the * * * statute * * and obtain a declaration of rights, status or other legal relations thereunder." N.J.S.A. 2A:16–53. (formerly N.J.R.S. 2:26–69). It was employed 30 years ago to test the validity of restrictions on advertising by optometrists, see *Abelson's, Inc. v. N.J. State Board, etc.*, 5 N.J. 412, 75 A.2d 867 (1950). The court observed that this modern remedy was in addition to the broad review long available under the former common law writ of certiorari, now superceded by the civil action in lieu of prerogative writ and made a remedy of right by *N.J.Const.*, 1947, Art. 6, § 5, par. 4, see 5 N.J. at 417–418, 75 A.2d 867. See, also, on this subject, *Super Tire, etc. v. McCorkle*, 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974) a case from this circuit, involving a declaratory judgment suit to challenge the validity of State agency regulations.

Thus, one clearly available route is the civil action in lieu of prerogative writ, or for declaratory judgment, or both. Since the Board is a state agency, the procedure specified is by filing a notice of appeal with the Superior Court, in its Appellate Division, N.J. Court Rule R. 2:2–3.

■ Another clearly available route is provided by New Jersey's Administrative Procedure Act, N.J.S.A. 52:14B–1, et seq., enacted by N.J.P.L.1968, c. 410. By section 8 of that act, N.J.S.A. 52:14B–8, every agency is empowered, on the request of an interested person, to make a declaratory ruling with respect to any state of facts, of any statute or rule enforced by that agency, and the ruling shall bind the agency and the parties on the state of facts alleged. Judicial review of the ruling is provided. By this route, plaintiffs may prepare and submit to the Board an array of graphics and text for proposed publication and obtain a ruling on the question whether the same, or any of them, do or do not contravene the statute and regulation in respect to public information. They are also free to compile a record on constitutional issues, as was done in *Bates*. A ruling that a particular text or texts among those presented is in compliance, would enable plaintiffs to use them, fully protected against the risk of disciplinary proceedings by reason of the binding effect on the agency. They are also free to have judicial review of any adverse rulings, as well as of constitutional matters raised, with an adequate record made during the proceedings.

■ The third route has been available since the enactment of N.J.P.L.1978, c. 73, allocated as N.J.S.A. 45:1–14, et seq. (pocket part). That statute has the purpose, among others, of achieving uniform standards for license revocation, suspension and other disciplinary proceedings before the various professional and occupational boards located within the Division of Consumer Affairs,

**532**

which itself is a part of the Department of Law and Public Safety, a principal department of New Jersey's executive branch, with the Attorney General as the administrative head, see N.J.S.A. 45:1–14. To achieve such uniformity, the Attorney General is directly authorized to promulgate substantive rules and regulations in respect to disciplinary matters for each such board, N.J.S.A. 45:1–17b. Since *N.J.Const.* 1947, Art. 1, par. 18 guarantees the right to petition for the redress of grievances, plaintiffs are free to present to the Attorney General their views in respect to the challenged regulations and request that he exercise his administrative power to see to the adoption of a different regulation or, if need be, to promulgate it himself.

These modern, flexible and highly efficient tools for the administrative processing and resolution of problems in the field of professional regulation and discipline, on the basis of specific states of fact, are largely borrowed from the similar mechanism established decades ago by the Supreme Court of New Jersey for the regulation of the legal profession. The problem arises because no draftsman, however skilled, can ever expect to prepare a set of rules to deal properly with every conceivable set of facts and circumstances that may arise in the future. By N.J. Court Rule R. 1:19 (formerly R.R. 1:26A), an Advisory Committee on Professional Ethics has been established, with authority to issue rulings and opinions on the question whether a course of conduct under a specific set of facts will or will not be in compliance with the rules governing the professional activities of lawyers; and its published opinions are binding on the separate Ethics Committees charged with investigation and enforcement of disciplinary matters.

The creation of the Advisory Committee on Professional Ethics recognizes that even lawyers, who are especially trained to analyze rules of law and apply them to specific states of fact, sometimes encounter difficulties in respect to matters involving their own profession. Obviously, other professionals who are not lawyers will have greater difficulties of this nature.

The setting up of a closely similar mechanism for professions other than law thus provides an important tool for obtaining a binding determination on a specific set of facts, in advance and without the risk of placing in peril a professional's license to practice, as is the case when the outmoded method of deliberate violation is chosen as the vehicle for testing. In this connection, see *Lucky Calendar v. Cohen*, 19 N.J. 399 at 408–409, 117 A.2d 487 (1955), a case involving commercial speech and the lottery laws, where Chief Justice Vanderbilt observed that a party seeking the benefit of an advance ruling on the lawfulness of particular conduct, should await the final determination before acting. In that case, the ruling below was favorable, i.e., that the intended conduct would not violate the law. The party then engaged in the conduct, without awaiting the outcome of the appeal, which was the other way, and thus needlessly exposed itself to charges under the law involved.

■ These available tools and mechanisms are of great significance in a case of this kind because they illustrate at least one very rational and effective manner in which the case–by–case adjudication which inevitably follows from *Virginia Pharmacy* and *Bates* can be made manageable. Quite soundly, Mr. Justice Powell expressed great concern in his dissent in *Bates*, 433 U.S. at 389, 97 S.Ct. at 2711–2712 et seq., about the considerable burden suddenly thrust upon regulatory bodies by that decision. While the mechanism discussed above may not solve all the problems, it is clearly capable of dealing effectively with a great many of them. A professional who proceeds without use of these mechanisms does so at his own risk, as made clear in *Lucky Calendar, supra.* One who does so also indicates, by what he does, that he puts a greater value on what he selfishly wants to do than on his professional compliance and reputation. If he be wrong, he cannot, in New Jersey at least, expect any credit to be given to the plea that he acted in good faith for the purpose of bringing a test case. This is

because a good faith purpose of this kind can be fully achieved through the use of these available mechanisms which erase the risk.

These available tools and mechanisms are also of great significance in a case of this kind because they provide a vehicle for presenting the question in a specific fact context against which a court can decide whether a plaintiff has met the burden, required by *Bates*, of demonstrating "that in fact his specific conduct" is protected under the First Amendment, 433 U.S. at 379, 97 S.Ct. at 2706–2707 et seq. The same showing is required on the claim of vagueness. For a case dealing with a *general* challenge to a regulation calling for provision of a "reasonable number" of beds for indigent patients, and for a "just and reasonable rate on equity", in the case of licensed nursing homes, see Mr. Justice Sullivan's opinion for a unanimous court in *N.J. Ass'n etc., v. Finley*, 83 N.J. 67, 415 A.2d 1147 (1980).

 Finally, these tools and mechanisms provide a vehicle for the development and adoption of a saving construction, if one be needed, by the agency or court having primary jurisdiction over the subject matter. This is the heart and core of the *Pullman* doctrine. Since it is the States that are vested with authority to regulate professions under the police power, and since federal challenges on constitutional grounds are only collateral to that power, the structure and relations of the federal system require that the state agency and the state courts be provided with the initial opportunity to deal with the question, as well as to develop the specific facts.

The soundness of *Pullman* is illustrated by the fact that when a federal court enters judgment declaring a state regulatory provision unconstitutional and enjoining its enforcement, it throws out the baby with the bath water. It creates a gap in the law, leaving no regulation on a subject admittedly subject to regulation.

The New Jersey courts have shown their own sensitivity to this undesirable consequence, and have gone so far as to adopt a construction in a form equivalent to enacting a statute, in order to save the law until those with primary authority have time to act, thus avoiding a gap. The prime example is *State v. De Santis*, 65 N.J. 462, 323 A.2d 489 (1974). The opinion of Mr. Justice Jacobs in that case noted that some state courts had stricken their obscenity statutes as unconstitutional, leaving no enforceable law on the books, while others adopted constructions capable of saving the statute prospectively. See, especially, the discussion in 65 N.J. at 468–474, 323 A.2d 489.

Another example is found in the cases dealing with Congressional and legislative reapportionment under the one man/one vote concept. From *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) through *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) and *Jackman v. Bodine*, 43 N.J. 453, 205 A.2d 713 (1964) and their progeny, the court is aware of no decision, federal or state, which invalidated laws enacted by a malapportioned legislature, or which ousted incumbent legislators from office, or enjoined the continuing operation of such a legislative branch. State courts, as in *Jackman*, have ruled that they could not abstain from ruling on the question whether an apportionment method denied equal protection of the law in violation of the Fourteenth Amendment, 43 N.J. at 457 et seq. 205 A.2d 713. But they have stayed their hand in respect to devising an apportionment method that meets constitutional muster "except as a last resort", allowing a malapportioned legislature meanwhile to function *de facto*, subject to the duty to devise a valid plan, 43 N.J. at 473, 205 A.2d 713.

There was no "saving construction" available in those cases, but where there was, as in *De Santis*, the New Jersey courts have never hesitated to adopt one and so apply the fundamental rule that controversies should be decided on non–constitutional grounds wherever possible.

 In cases like this, involving state statutes and regulations, brought in a federal court, *Pullman* requires that the saving

construction question, which is a matter of State law, be taken up by the state agency or court first, with the federal court meanwhile abstaining by ordering a stay while the state proceedings are conducted and concluded. The proper course is to retain jurisdiction, or if the case be dismissed, to make clear that the dismissal is without prejudice to litigate the federal claims in federal court at the conclusion of the state proceeding. See *American Trial Lawyers Association v. N. J. Supreme Court*, 409 U.S. 467, 93 S.Ct. 627, 34 L.Ed.2d 651 (1973), where it is observed that abstention does not involve the abdication of federal jurisdiction but only the postponement of its exercise, citing *England v. Louisiana State Board of Medical Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964). For the ensuing state proceeding, see 66 N.J. 258, 330 A.2d 350 (1974).

In the present case, the current regulation of the Board on its face does allow a licensee to provide information to the public, by publication in newspapers and comparable written publications, including "fees for routine professional services", thus evidently recognizing the right protected by *Bates*. See, also, *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975) dealing with the use of suggested "minimum fee" schedules, a related subject, and the text of the Statement of the Judicial Council of the AMA, published in 235 JAMA 2328 (1976) and reproduced in *Bates*, 433 U.S. at 369, footnote 20, 97 S.Ct. at 2701–2702, footnote 20.

For each and all of the foregoing reasons, the motion for preliminary injunction is denied, and the suit will be stayed pending the conclusion of appropriate state proceedings to be initiated without delay.